Leland STUMP and Sue Carole Stump,
Appellants–Plaintiffs,

v.

INDIANA EQUIPMENT COMPANY, INC., Macallister Machinery Company, Inc., Steuben County Highway Department and the Steuben County Board of Commissioners, Appellees–Defendants.

No. 49A02–9105–CV–193.

Court of Appeals of Indiana,
Second District.

Oct. 27, 1992.

Rehearing Denied Nov. 25, 1992.

John F. Vargo, Pardieck, Gill & Vargo, Seymour, Frank J. Price, Ricos & Price, Gloria K. Grinnan, Pardieck, Gill & Vargo, Indianapolis, for appellants-plaintiffs.

R.D. Zink, Meils Zink Thompson & Dietz, Indianapolis, for appellee-defendant Indiana Equipment Co. Inc.

Donald J. Graham, Nana Quay–Smith, Karl L. Mulvaney, Bingham Summers Welsh & Spilman, Indianapolis, for appellee-defendant MacAllister Mach. Co.

John D. Walda, John F. Lyons, Barrett & McNagny, Fort Wayne, for appellees-defendants Steuben County Highway Dept. and the Steuben County Bd. of Com'rs.

SULLIVAN, Judge.

Leland Stump and Sue Stump (hereinafter collective referred to as "Stump") appeal from the trial court's grants of summary judgment in favor of both Indiana Equipment Company and MacAllister Machinery Company. Steuben County Highway Department and the Steuben County Board of Commissioners (hereinafter collectively referred to as "Steuben County") cross-appeal the trial court's denial of their Motion for Summary Judgment.

We affirm in part, reverse in part, and remand for further proceedings.

The appeal involves an injury sustained by Stump while working with a piece of heavy equipment, a grader.

Stump presents three issues for our review, which we state as follows:

I. Whether Stump's actions against Indiana Equipment and MacAllister, respectively, are barred by the product liability statute of repose;

II. whether Indiana Equipment and MacAllister, respectively, owed a

duty to Stump upon which a finding of negligence may be premised; and

III. whether Indiana Equipment and MacAllister, respectively, were absolved of liability resulting from the condition of the grader by virtue of the "as is" clause contained in the sales contract?

We note at the outset that Stump filed a motion with this court to dismiss the cross-appeal of Steuben County. Steuben County's Motion for Summary Judgment below was denied, while similar motions submitted by defendants Indiana Equipment and MacAllister were granted. Ordinarily, the denial of a summary judgment motion is not a final, appealable order from which an appeal will lie. *Loving v. Ponderosa Systems, Inc.* (1985) Ind., 479 N.E.2d 531, 532. Nevertheless, Ind. Rules of Procedure, Appellate Rule 4(B)(6) permits the taking of an interlocutory appeal in certain circumstances in which the trial court's ruling is not a final appealable order. In such instances, however, a trial court must certify its ruling for interlocutory appeal in accordance with the provisions of App.R. 4(B)(6). The record reveals that Steuben County did not seek certification of the denial of its summary judgment motion. Therefore, we hereby grant Stump's Motion to Dismiss the cross-appeal of Steuben County.

When reviewing a grant of summary judgment, we accept as true the facts alleged by the nonmoving party. *Majd Pour v. Basic American Medical, Inc.* (1990) 2d Dist. Ind.App., 555 N.E.2d 155.

The following facts are alleged by Stump: On August 13, 1986, Stump was employed by Hitzfield Excavating and was operating a 20–year–old Galion Motor Grader near Fort Wayne, Indiana. He had been operating the grader for a short period of time when he noticed that oil was spattering on the hood. Stump halted the grader, shifted into neutral gear, and shut off the motor. Stump then climbed off the grader and, with the assistance of another Hitzfield employee, removed the side panel which covered the motor. Although the two men could see oil spattered on the motor, they could not discern the precise location or severity of the leak. Stump decided that the best way to pinpoint the leak was to start the engine and watch the motor while it was running. In order to accomplish this, and in order to be in position to shut the motor off immediately should the need arise, Stump positioned himself on the ground beside the grader so that he could push the starter button and view the engine at the same time.

When Stump pushed the starter button, the motor came to life and the grader almost immediately began to move backward. Stump was able to jump away from the grader and escape injury initially, but he then observed that the grader was rolling toward a building in which people were working. Stump ran after the grader, caught up to it before it reached the building, and attempted to pull himself into the driver's seat. Just as Stump was mounting the grader, it struck a curb with such force that he was knocked to the ground. He fell in such a position that the grader's blade pinned him against the curb, and he suffered a traumatic amputation of both legs.

Based upon the various pleadings, depositions and exhibits, the Galion grader originally was equipped with a neutral safety switch which, if functioning correctly, would have prevented the grader from starting while in gear. The neutral safety switch is comprised of two components. The electronic component is a microswitch located in the wiring unit between the starter switch and the starter solenoid; this wiring unit is known as the starter harness. The mechanical component of the neutral safety switch consists of a linkage system located in or near the transmission. A post-accident inspection of the grader revealed that the starter switch was wired directly to the starter solenoid, thus bypassing the microswitch.

This particular grader was originally sold by Indiana Equipment to Steuben County in 1967. Steuben County owned and operated the grader continuously until sometime in 1985, when it decided to trade the Galion grader for a new grader. Accord-

ingly, Steuben County contacted MacAllister, a dealer of Caterpillar graders, and requested a bid for the purchase of a new grader. On October 29, 1985, a MacAllister employee inspected the Galion grader in order to estimate its value for trade-in purposes.

MacAllister eventually was awarded the bid and sold a new Caterpillar grader to Steuben County and accepted the Galion grader as a trade-in. MacAllister was aware that Hitzfield was interested in purchasing a used grader, and thus informed Hitzfield that the Galion grader formerly owned by Steuben County was for sale. Hitzfield's owner inspected the Galion grader and agreed to buy it "as is/where is" from MacAllister. Additionally, Hitzfield agreed to deliver the new grader from MacAllister to Steuben County while picking up the Galion grader, which was still in Steuben County's possession. On January 28, 1986, Hitzfield delivered the new grader to Steuben County and, after a brief discussion with the man who had operated the Galion grader for Steuben County, Hitzfield took possession of the Galion grader. Stump was injured approximately six months later.

When reviewing a grant of summary judgment, our task is the same as that of the trial court: we determine whether there was a genuine issue of material fact and whether the moving party was entitled to judgment as a matter of law. *Lilge v. Russell's Trailer Repair* (1991) 4th Dist. Ind.App., 565 N.E.2d 1146, 1148. All evidence must be construed in a light most favorable to the nonmovant, and any doubt as to the existence of a material issue must be resolved against the movant.

### I. *Statute of Repose*

The trial court granted the summary judgment motions of both Indiana Equipment and MacAllister at least partially upon the ground that actions against both were barred by the statute of limitations applicable to products liability actions contained in I.C. 33–1–1.5–5 (Burns Code Ed. 1992)—a so-called "statute of repose." The court's ruling was premised upon the fact that the grader had been delivered to Steu-

ben County more than ten years prior to the accident. Stump argues that the statute of repose is inapplicable in the instant case.

I.C. 33–1–1.5–5 provides:

"(a) This section applies to all persons regardless of minority or legal disability. Notwithstanding IC 34–1–2–5, it applies in any product liability action in which the theory of liability is negligence or strict liability in tort.

(b) Except as provided in section 5.5 [IC 33–1–1.5–5.5] of this chapter, a product liability action must be commenced within two (2) years after the cause of action accrues or within ten (10) years after the delivery of the product to the initial user or consumer. However, if the cause of action accrues at least eight (8) years but less than ten (10) years after that initial delivery, the action may be commenced at any time within two (2) years after the cause of action accrues."

The statute of repose expressly applies to "any product liability action." The initial question, then, is whether the instant case is a product liability action. In making this determination, we are mindful that a proper interpretation of any particular section of a statute results only when the words in that section are considered in the context of the entire statute. *Dague v. Piper Aircraft Corp.* (1981) 275 Ind. 520, 418 N.E.2d 207, 210.

The product liability statute of repose commences to run upon the delivery of a product to the "initial user or consumer." Its purpose is to place a temporal limit upon liability for a product's defects. *Dague, supra,* 418 N.E.2d at 210. The defects to which the statute applies are those present "at the time it is conveyed by the seller to another party," I.C. 33–1–1.5–2.5 (Burns Code Ed.1992). It is therefore apparent that a "product liability action," as contemplated by the statute of repose, is an action in which the plaintiff complains of a defect which existed at or before the time the product was delivered by the seller to the initial user or consumer. The "seller" of any such defective product is immune from suit after the prescribed peri-

od of time has elapsed. Therefore, we hold that the ten-year statute of repose is implicated only if the complained-of defect was present at or before the time the grader was delivered to the initial user or consumer.[1]

■ As to who may claim the defense, the definition of "seller", i.e., "person engaged in business as a manufacturer, a wholesaler, a retail dealer, a lessor, or a distributor," I.C. 33–1–1.5–2 (Burns Code Ed.1992), is broad enough to include within its scope any party who was an essential part of the stream of commerce which resulted in delivery to the initial user or consumer. On the other hand, *no* party may assert the statute as a defense if the action is based upon a latent or patent defect which did not exist at the time of delivery to the initial user.

Our interpretation is consistent with the statute's purpose. The legislation was designed to relieve those parties involved in introducing products into the stream of commerce from open-ended liability premised upon the product's condition at the time of entry into the marketplace. However, it does not follow that *all* parties are absolved of liability for *all* claims of negligence concerning a particular product when more than ten years has elapsed since that product was delivered to the initial user. Our legislature simply could not have intended such a wide-sweeping result. Were we to so totally absolve all parties of liability, we would remove an important incentive for the use of care when inspecting, handling, and maintaining products that are more than ten years old. Such an interpretation does not comport with sound public policy.

■ Applying the foregoing analysis to the instant case, neither Indiana Equipment nor MacAllister may claim the statute of repose as a defense. The defect which Stump alleges proximately caused his injuries was not a defect which existed at the

time the Galion grader was delivered to Steuben County. The defect which Stump alleges caused his injuries was the "wiring around" of the neutral safety switch. There is no allegation that this defect existed at the time that the grader was initially delivered to Steuben County. Indeed, all parties agree that the rewiring occurred subsequent to the initial delivery.

We hold that an action involving post-sale (post-initial delivery) negligence, as opposed to a defect present at the time of that initial delivery, is not subject to the ten-year statute of repose which, as earlier noted, begins to run at the time of delivery. Thus, the statute of repose does not bar Stump's claim against MacAllister or Indiana Equipment.

## II. *Duty*

■ Indiana case law has traditionally held that in order to recover upon a theory of negligence, the plaintiff must prove a duty flowing from the defendant to the plaintiff. *Tucher v. Brothers Auto Salvage Yard, Inc.* (1991) 1st Dist. Ind.App., 564 N.E.2d 560, *trans. denied.* The duty owed is determined by the relationship of the parties to each other. *Gariup Construction Co., Inc. v. Foster* (1988) Ind., 519 N.E.2d 1224. Although the determination is treated as a question of law, the trial court must, in the process, necessarily draw conclusions as to questions of fact. *See Harper v. Guarantee Auto Stores* (1989) 1st Dist. Ind.App., 533 N.E.2d 1258, *trans. denied; but see Kinsey v. Bray* (1992) 1st Dist. Ind.App., 596 N.E.2d 938. The duty, when found to exist, is the duty to exercise reasonable care under the circumstances. The duty never changes. However, the standard of conduct required to measure up to that duty varies depending upon the particular circumstances. *Walters v. Kellam and Foley* (1977) 2d Dist., 172 Ind.App. 207, 360 N.E.2d 199.[2]

The trial court granted summary judgment in favor of both Indiana Equipment

---

1. There is no contention from which it could be deduced that a replacement neutral safety switch is the product in question rather than the grader.

2. At least one observer has criticized the relationship/foreseeability/public policy analysis as the basis for determining the existence of a duty. *See* Tidmarsh, *Tort Law: The Languages of Duty,* 25 Ind.L.Rev. 1419, 1425 *et seq.*

and MacAllister at least partially upon the ground that neither owed a duty to Stump with regard to the "wiring around" of the neutral safety switch.

### A. *Indiana Equipment*

■ Initially, Indiana Equipment seeks to escape liability altogether in this area by invoking the rule of imputed knowledge. According to this rule, a principal is deemed to know what his agent knows, so long as the agent's knowledge was acquired while the agent was acting within the scope of his agency. *Conrad v. Olds* (1941) 110 Ind.App. 208, 37 N.E.2d 297. Indiana Equipment argues that Steuben County's grader operator knew of the wiring defect, and that therefore Steuben County knew. Thus, Indiana Equipment argues, even if it had a duty to warn Steuben County of the defect, failure to perform its duty was harmless because Steuben County already "knew".

Imputed knowledge is a tenet of agency law, and is based upon an underlying legal fiction of agency—the identity of principal and agent when the agent is engaged in the principal's business. Under this rule, the law imputes the agent's knowledge to the principal, even if the principal does not actually know what the agent knows.

■ Imputed knowledge is similar to another legal fiction in agency law—respondeat superior. Respondeat superior is the principal which, under certain circumstances, confers upon a principal liability for the acts of his agent. The doctrine of respondeat superior creates liability for a principal where it would otherwise not exist. *Shelby v. Truck & Bus Group Division of General Motors Corp.* (1989) 4th Dist. Ind.App., 533 N.E.2d 1296. The doctrine has its origin in public policy and justice. As Lord Chief Justice Best stated in *Hall v. Smith* (1824), 2 Bing 156, 130 Eng. Reprint 265, 267 (1912): "The maxim

of respondeat superior is bottomed on this principal: that he who expects to derive advantage from an act which is done by another for him must answer for any injury which a third person may sustain from it." The doctrine therefore came about as a means of extending liability. So it is with the doctrine of imputed knowledge.

■ The rule of imputed knowledge also is a rule of public policy based upon the precept that when a principal acts through an agent, a third party dealing with the agent is entitled to rely upon the agent's knowledge, which binds the principal. In practical application, the rule is applied in order to accomplish the following result: The risks of an agent's infidelity or lack of diligence should fall upon the one who delegates authority to that agent, rather than upon innocent third parties. *State Farm Fire & Casualty Co. v. Sevier* (1975) 272 Or. 278, 537 P.2d 88. As with respondeat superior, the rule of imputed knowledge, with one exception not relevant here,[3] is a means of extending liability to a principal. As stated in the *Restatement (Second) of Agency*, the rules included in the chapter discussing a principal's liability to third parties based upon the agent's notice "are stated in terms of the liability of the principal because the cases in which the language of imputed knowledge is used are those involving the principal's liability for the conduct of the agent." *Id.* at 582. Such is not the case here.

Indiana Equipment attempts to invoke the rule in the instant case to *shield* itself from liability. However, the undisputed evidence shows that Indiana Equipment never discovered the defect. The evidence therefore does not reflect that Indiana Equipment knew that Steuben County's operator was aware of the defect. Indiana Equipment attempts to escape liability by seizing upon the fortuitous fact, learned

---

**3.** The Introductory Note to the chapter entitled "Liability of Principal to Third Persons: Notice Through an Agent" in the *Restatement (Second) of Agency* explains the exception:

"However, the knowledge of an agent may be a source of benefit to the principal. Thus, an agent may be privileged to act because of knowledge which he has, as where a servant

is privileged to make an arrest because of his knowledge of facts indicating the guilt of the one arrested. Properly the courts do not impute the knowledge of the agent to the principal in such cases, but relieve him from liability on the ground that the agent committed no tort." *Id.* at 582.

strictly through hindsight, that the operator knew of the defect. This is a misapplication of the rule of imputed knowledge.

The crux of the complaint against Indiana Equipment is that it should have discovered and warned of the defect, and that its failure to do so was a proximate cause of Stump's injuries. The focus of the inquiry into its liability, if any, will be upon Indiana Equipment's actions and knowledge at the time of the various repairs. Indiana Equipment contends that failure to warn Steuben County of the defect was of no consequence because Steuben County already (constructively) "knew". In fact, there is evidence that no one at Steuben County except the operator knew of the defect. There is also an affidavit of the Steuben County official charged with overseeing equipment maintenance to the effect that had he known the defect existed, he would have authorized repairs to the neutral safety switch.

█ In summary, there is a question. of fact, *inter alia*, as to whether the defect would have been repaired had Indiana Equipment discovered and warned the appropriate personnel at Steuben County of the problem. The determination of whether Indiana Equipment's actions were reasonable under the circumstances must be measured in light of what Indiana Equipment knew and did at the time of repairs. It may not escape liability by invoking a legal fiction intended for use in a different context.

The trial court held that Indiana Equipment had no duty to repair the neutral safety switch:

"And the Court ... now finds:

\* \* \* \* \* \*

5. That no evidence exists that Defendant, Indiana Equipment, caused any alteration to the neutral safety switch which led to Plaintiff's accident.
6. That the evidence is undisputed that Indiana Equipment was never requested to repair the neutral safety switch.

Indiana Equipment had no legal duty to repair anything that they had not been requested to repair.
7. That since Indiana Equipment was never requested to repair the neutral safety switch, and since Indiana Equipment never performed any repairs with respect to said neutral safety switch, Indiana Equipment never breached any legal duty giving rise to liability for Plaintiff's accident." Record at 352–53.

Indiana Equipment next argues that it had no duty because it never asked to repair the neutral safety switch. It contends that the real issue before us is "must a mechanic repair [or warn about] that which he has not been requested to repair?" Brief of Appellee, Indiana Equipment Company at 5.

Stump contends that although Indiana Equipment had never been specifically asked to repair the neutral safety switch, it nevertheless should reasonably have discovered and, at a minimum, warned of the defect in the course of its various repairs of the grader. Although it is true that Indiana Equipment was never asked to repair the neutral safety switch, that fact alone does not settle the question.

Stump deposed Donald Herman, a mechanic employed by Indiana Equipment who had worked on the Galion grader. Herman stated that the neutral safety switch is an important safety feature which should be examined regularly to ensure that it is functioning properly.[4] He inspected the Galion grader immediately post-accident and discovered that the electronic component of the neutral safety switch was missing and the switch was inoperable. He indicated that the bypass wiring had probably been in place at least two years, but could not be certain whether it had been in place more than three years. In his opinion, the wiring bypass was a result of "shortcuts on repair." Record at 672.

The repair history of the grader reveals that on August 28, 1970, Steuben County

---

**4.** The safety switch is not essential to the actual physical starting of the grader. Its sole purpose is to prevent the grader from being started while in gear and thus moving suddenly so as to endanger persons on or near the grader.

received a new microswitch. However, it is not clear whether, or by whom, the switch was installed. Indiana Equipment performed major transmission repairs upon the grader in the summer of 1978, and in the course of that work replaced the wiring harness, which includes the starter harness containing the electronic component of the neutral safety switch. Herman stated that in reassembling the transmission, the shifter linkage would be reconnected and the neutral safety switch reinstalled. Herman stated that the transmission reinstallation would include ensuring that the neutral safety switch was "functioning," i.e., that the grader would start with the gear in neutral. However, such testing would not include attempting to start the grader while in gear. Herman indicated that when the wiring harness was reconnected, all of the wires should have been properly connected, including the neutral safety switch, even if the switch had previously been bypassed.

In early 1982, Indiana Equipment again performed extensive repairs upon the transmission, which again required disconnecting and reinstalling the neutral safety switch. Herman responded in the affirmative when asked whether, upon reinstallation, the mechanic "would have to hook up the neutral safety switch again mechanically and [should] make certain that it was functioning with the levers". Record at 695–96.[5]

On July 24, 1985, Indiana Equipment again removed and reinstalled the transmission. Herman stated that the neutral safety switch was present (both the microswitch and the linkage) on the grader when it was reinstalled approximately one month later. However, although Herman checked the mechanical component, he did not determine whether the microswitch was working. Finally, Herman agreed that at the October 28, 1985 inspection, it would have been a good practice to inspect the neutral safety switch, but he did not remember doing so.

In order to prevail upon summary judgment, it was incumbent upon Indiana Equipment to demonstrate that there were no reasonable inferences which a trier of fact could draw indicating that the duty to use reasonable care included a duty to inspect, discover, and warn of the wiring anomaly. Based upon our review of the foregoing facts, we conclude that Indiana Equipment has not made such a showing.

### B. MacAllister

The court granted summary judgment in favor of MacAllister partially upon the ground that it owed no duty to Hitzfield to discover and warn of the nonfunctional neutral safety switch. Mindful that the duty owed to any party in any particular circumstance is the duty to exercise reasonable care, we consider here whether MacAllister's duty to use reasonable care in the instant case included the duty to inspect, discover, and warn of the defect.

MacAllister's only connection with the Galion grader was as an intermediary party. It sold a new grader to Steuben County and accepted the Galion grader as a trade-in. Pursuant to that sale, MacAllister inspected the grader for its own appraisal purposes. MacAllister then sold the Galion grader to Hitzfield without ever taking physical possession; the grader remained with Steuben County until it was picked up by Hitzfield.

Stump cites *Baker v. Midland–Ross Corp.* (1987) 1st Dist. Ind.App., 508 N.E.2d 32, *trans. denied*, in support of his argument that MacAllister's duty included a duty to inspect, discover, and warn of the defect. To the contrary, *Baker* lends no support to the proposition that "if a dealer repairs or inspects a product and becomes aware or should have become aware that a safety system has been bypassed, the dealer may have the duty to warn or inform the plaintiff user." Brief of Appellant at 41. A dealer's duty in that regard was an issue

---

**5.** "Levers" refers to shifting levers with which the neutral safety switch must make contact in order to prevent starting while in gear. Record at 701. The contact point between the neutral safety switch and the levers is apparently a bracket which comes out of a roller protruding from the switch—the roller being the activator for the microswitch. Record at 737.

in *Baker* at the trial stage, but was not a factor in the decision upon appeal.[6] However, even if Stump's assertion as to *Baker*'s meaning were accurate, that case is distinguishable from the instant case. In *Baker*, the repairmen went into the plaintiff's place of employment in order to repair a furnace. Clearly, the work performed upon the furnace was for the employer's benefit, and the employer relied upon defendant's expertise, a reliance which the defendant should reasonably have anticipated.

In the instant case, the issue with regard to MacAllister is whether it had a duty to inspect the grader; and, if so, the nature of that duty. Indiana and other states have addressed similar questions with regard to used car dealers.

■ In *Masker v. Smith* (1981) Fla.Ct. App., 405 So.2d 432, a used car buyer sued the used car dealer from whom he had purchased a car, after the car's brakes had failed. In affirming a grant of summary judgment in favor of the dealer, the appellate court concluded that the latent or patent nature of the defect was critical to the analysis. After determining that the complained-of defect was latent, the court stated:

> "Whatever may be the duty of a used car dealer to inspect a vehicle prior to sale for defects which could or might be discovered by reasonable and customary inspection, a point not before us and therefore one which we do not decide, we are not aware of any duty on such dealer to discover *latent* defects which by their very nature could not be discovered by a reasonable and customary inspection." (Emphasis in original) *Id.* at 433–34.

We conclude that the principle enunciated above applies not only to used automobile dealers, but also to dealers in used equipment such as the Galion grader. It is therefore apparent that a trade-in dealer, such as MacAllister in the instant case, has a duty to inspect and discover *patent* defects in the used equipment that it sells.

■ In *Crothers by Crothers v. Cohen* (1986) Minn.App., 384 N.W.2d 562, the court addressed the scope of a used car dealer's duty to inspect. The court approved the use of the following jury instruction, concluding that it allowed the jury to "determine whether the defect was patent or latent and whether Defendant's salesman used ordinary care." *Id.* at 565. The instruction read:

> "Seller has a duty to use ordinary care to discover obvious defects which would constitute a menace or source of danger. The seller is not required to disassemble the vehicle to make this observation." *Id.* at 565.

The duty to inspect as defined in *Crothers* is therefore to be considered in harmony with the principle underlying the holding in *Masker;* the scope of the inspection is measured in the context of reasonableness under the circumstances and involves an evaluation of the facts of the particular case. We acknowledge that, ordinarily, such fact-sensitive questions are not susceptible to summary adjudication. However, when undisputed facts so warrant, summary judgment may be appropriate.

Here, the lone inspection performed upon the Galion grader by MacAllister was for MacAllister's own benefit. An inspection undertaken for appraisal purposes differs significantly from the sort of exhaustive inspection generally made for purposes of

---

6. In *Baker*, the plaintiff was injured when a furnace which had been manufactured by defendant exploded. Prior to the accident, someone had modified the furnace, and the modification was later determined to have been the cause of the explosion. Several days before the explosion, several employees of the defendant were working on a furnace situated next to the one that exploded. Plaintiff sued in part upon the theory that defendant's employees should have seen and discovered the modification in the furnace, and then warned plaintiff's employ-

er that the modification posed an increased risk of explosion. Accordingly, plaintiff tendered an instruction concerning post-sale negligence based in large part upon Restatement (Second) of Torts § 324A. The trial court refused the instruction upon the ground that the complaint alleged only strict liability; thus, post-sale negligence was not an issue. Our First District reversed, holding that the issue of post-sale negligence had been tried by implied consent, based upon certain actions of the parties during the course of litigation.

ascertaining and advising whether equipment is reasonably safe for use. Additionally, the Galion grader never came into MacAllister's physical possession, which further dilutes the argument that MacAllister's duty of reasonable care included inspecting the grader thoroughly enough to discover the bypassed switch.

MacAllister's status as a trade-in dealer defined its duty of inspection. It performed only an appraisal inspection for trade-in purposes, never performed any clean-up or repair work on the grader prior to resale, and indeed never took physical possession of the grader at all. As a trade-in dealer, reasonable care would not include inspecting the grader thoroughly enough to discover the bypassed neutral safety switch and warning Hitzfield of the defect. In this regard, it appears that the wiring bypass would not be discoverable unless a portion of the grader's panelling were removed so as to expose the internal portions of the switch including the microswitch.

Even though there may be conflicting facts or conflicting inferences which might be drawn from undisputed facts as to certain elements of a claim, summary judgment is nevertheless appropriate where there is no real conflict regarding a fact dispositive of the litigation. *Johnson v. Patterson* (1991) 4th Dist. Ind.App., 570 N.E.2d 93; *Watson v. Medical Emergency Services Corp.* (1989) 2d Dist. Ind.App., 532 N.E.2d 1191, *trans. denied.*

As against MacAllister, Stump's complaint alleges only that MacAllister "should have known of the dangerous condition". There is no evidence of record from which plaintiff could have asserted that MacAllister had actual knowledge of the rewired condition of the switch. The existence of any such actual knowledge would necessarily be based solely upon unfounded speculation. It is therefore a non-issue in this case.

Accordingly, the trial court correctly granted MacAllister's motion for summary judgment, not because MacAllister owed no duty to Stump, but rather because MacAllister's duty of reasonable care did not require that it inspect, discover, and warn of the hidden defect.

### III. *"As Is" Clause*

Although the trial court did not grant Indiana Equipment's summary judgment motion upon the ground that the "as is" clause in the contract of sale between MacAllister and Hitzfield absolved any previously negligent parties of liability, Indiana Equipment nevertheless argues such is a proper ground for granting its motion.

In support of its argument, Indiana Equipment cites *Stapinski v. Walsh Construction Co.* (1979) 272 Ind. 6, 395 N.E.2d 1251. In *Stapinski*, the plaintiff was injured when the front drive shaft of his employer's truck broke loose and flew through the windshield while he was driving. It was later determined that the shaft broke loose because of a failure to grease the joint, which in turn had occurred as a result of a missing grease fitting. Plaintiff's employer had purchased the truck "as is" from defendant, a construction company which had used the truck in its business. Our Supreme Court affirmed the trial court's grant of summary judgment on the ground that when a non-dealer owner sells a vehicle "as is", the former owner cannot be held liable for personal injuries to a bystander. However, the *Stapinski* holding is inapplicable to the instant case.

The phrase "as is" when used in a contract for the sale of goods refers to warranty disclaimer. I.C. 26–1–2–316 (Burns Code Ed.Supp.1992) states:

"(a) Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults", or other language *which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty*". (Emphasis supplied.)

Indeed, our research of Indiana cases reveals no instances in which an "as is" clause was construed to refer to anything but disclaimer of warranties. *Stapinski* is no different. There, the Supreme Court stated: "[Defendant] had no representative present at [plaintiff's employer's pre-sale]

inspections [of the truck] *and expressly disclaimed any warranty of condition, completing the sale 'as is.'*" (Emphasis supplied) 395 N.E.2d at 1253. In sum, unless the parties expressly indicate otherwise, an "as is" clause in a sales contract has implications only upon the issue of disclaimer of warranties. *See DeVoe Chevrolet–Cadillac, Inc. v. Cartwright* (1988) 4th Dist. Ind.App., 526 N.E.2d 1237, 1240 ("as is" clause in car sale contract disclaimed any implied warranty); *Perfection Cut, Inc. v. Olsen* (1984) 3d Dist. Ind.App., 470 N.E.2d 94, 95 ("as is" clause contained in a contract for the sale of a used vac/blower meant that there were to be no implied warranties of merchantability or fitness for purpose).

 The "as is" clause in the sales contract served only to negate any implied warranties that may otherwise have extended from MacAllister to Hitzfield. The clause did not absolve any other party, including Indiana Equipment, of liability for independent negligence with regard to the Galion grader.

Inasmuch as the trial court's grant of summary judgment in favor of MacAllister is sustainable upon other grounds, we need not address MacAllister's liability in light of the "as is" clause.

We affirm the trial court's grant of summary judgment in favor of MacAllister Machinery, we reverse the grant of summary judgment in favor of Indiana Equipment Company, and remand to the trial court with instructions to reinstate Stump's complaint against Indiana Equipment Company, and for further proceedings not inconsistent herewith.

SHIELDS and BARTEAU, JJ., concur.