

**FILED**

Aug 05 2015, 9:30 am

CLERK

of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS

Christopher A. Pearcy
Theodore J. Blanford
Hume Smith Geddes Green & Simmons, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

James H. Young
Young & Young
Indianapolis, Indiana

Edward R. Hannon
Steuerwald Hannon & Witham, LLP
Danville, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| BGC Entertainment, Inc. d/b/a Brad's Gold Club and 3551 Lafayette Road Corp. d/b/a Brad's Gold Club, | August, 5, 2015 |
| Appellants-Defendants, | Court of Appeals Case No. 49A05-1408-CT-373 |
| v. | Appeal from the Marion Superior Court. |
| | The Honorable Patrick L. McCarty, Judge. |
| Jerry Coleman Buchanan, by His Father and Guardian, Odell Buchanan, | Cause No. 49D03-0801-CT-1607 |
| *Appellee-Plaintiff* | |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellants-Defendants, BGC Entertainment, Inc. d/b/a Brad's Gold Club and 3551 Lafayette Road Corp. d/b/a Brad's Gold Club (collectively, BGC), appeal the trial court's denial of summary judgment in a negligence action brought by Appellee-Plaintiff, Jerry Coleman Buchanan (Buchanan), by his father and guardian, Odell Buchanan.

We affirm.

## ISSUES

BGC raises two issues on appeal, which we restate as the following:
(1) Whether the trial court erred in denying its motion for summary judgment regarding its liability under Indiana's Dram Shop Act; and
(2) Whether the trial court erred in denying its motion for summary judgment regarding its liability under the common law.

Buchanan raises one issue on cross-appeal, which we restate as follows: Whether the trial court erred in denying his motion for partial summary judgment regarding the issue of BGC's imputed knowledge.

Shortly before 9:00 p.m. on July 28, 2007, Candice Vowell (Vowell) arrived at BGC—a bar and adult entertainment club—in Indianapolis, Indiana, to begin her shift as a cocktail waitress. Vowell's mother, Shannon Vowell (Shannon), was also a cocktail waitress at BGC, and they were both scheduled to work that night until the bar closed at 3:00 a.m. BGC has a policy that prohibits its bartenders and waitresses from consuming any alcohol while working, although they are permitted to have one free drink at the end of their shifts. Yet, Vowell explained that shortly after she clocked in, the whole staff joined together to have a shot of vodka in commemoration of the Brickyard 400 NASCAR race, which would occur the following day at the Indianapolis Motor Speedway.

In light of the Brickyard 400 weekend festivities, BGC had a large crowd of patrons throughout the night. During her six-hour shift, Vowell stated that she did not consume any additional alcoholic beverages. After the bar closed and while the staff was completing their usual end-of-shift reporting and clean-up, one of the bartenders poured a shot of vodka for Vowell as her complimentary end-of-shift drink. According to Vowell, her drink was 2.5 ounces rather than the standard 1.25-ounce shot. At approximately 3:30 a.m., both Vowell and Shannon clocked out, and neither of them doubted that Vowell was fit to drive herself home. Because Vowell and Shannon lived in the same apartment

---

[1] An oral argument for this case was held on July 7, 2015, at the Indiana Court of Appeals courtroom in Indianapolis, Indiana. We would like to thank the attorneys for their excellent advocacy.

complex, Shannon drove behind Vowell. For the duration of their drive home, Vowell and Shannon spoke to each other via cell phone.

[7] As Vowell and Shannon drove east on Kessler Boulevard, a black male wearing no shirt and dark pants—later identified as Buchanan—was walking west "in the middle of the [eastbound] lane." (Appellants' App. p. 136). Near the intersection of Kessler Boulevard and Ditch Road, Vowell collided with Buchanan, whom she had not seen walking in the roadway. The impact shattered Vowell's windshield, and she informed Shannon that she had "just hit something," and Shannon indicated that she saw a white plastic bag fly up into the air. (Appellants' App. p. 161). Although they were unsure of what Vowell had crashed into, neither Vowell nor Shannon stopped to investigate. Instead, because Vowell could no longer see through her windshield, Shannon drove around her in order to guide Vowell the rest of the way home. An oncoming motorist, Ryan McCullough (McCullough), had witnessed the entire event. He described that upon impact with the front of Vowell's vehicle, Buchanan bounced up and smashed into the windshield before flipping two times in the air and falling to the ground. McCullough noted that neither Vowell's vehicle nor Buchanan made any attempt to avoid the collision. McCullough reported the hit-and-run to 9-1-1 and waited with Buchanan, who was lying unresponsive in the street, until emergency personnel arrived.

[8] When Vowell arrived home, she awoke her husband in a panic and told him that she had hit something with her vehicle. Vowell's husband went outside to inspect her vehicle, and after observing the shattered windshield and the

substantial front-end damage, he left in his own vehicle to see if he could determine what she had struck. When he returned a little while later, Vowell's husband informed her that an ambulance and police vehicles were at the scene because she had hit a pedestrian—*i.e.*, Buchanan. At approximately 6:00 a.m., Vowell called the police to report her involvement in the accident.

[9] Detective Bruce Wright (Detective Wright) of the Marion County Fatal Alcohol Crash Team arrived at Vowell's apartment to investigate. After administering Vowell's *Miranda* warnings, Detective Wright "detected an odor of an alcoholic beverage about [her] person," and Vowell admitted that she had consumed "a shot of '3 Olives Vodka' at her place of employment immediately prior to driving her vehicle." (Appellants' App. p. 89). Detective Wright also examined Vowell's vehicle parked in front of her apartment and "noticed blood, pieces of flesh and hair in the shattered windshield." (Appellants' App. p. 252). After Vowell agreed to submit to a chemical test, Detective Wright transported her to Wishard Hospital for a blood draw. Three hours after the accident, at 7:08 a.m., Vowell's blood alcohol content (BAC) was 0.06%. Two expert toxicologists concluded that Vowell's BAC at the time of the accident would have been approximately 0.10% to 0.128%. Based on her BAC, both experts also agreed that Vowell's alcohol intake must have exceeded the two shots of vodka that she claimed to have consumed at BGC.

[10] As a result of the collision, Buchanan sustained severe brain trauma, a broken nose, and fractures to both lower bones in his right leg. On July 14, 2008, pursuant to a plea agreement, Vowell pled guilty to one Count of operating a

motor vehicle while intoxicated causing serious bodily injury, a Class D felony, Ind. Code § 9-30-5-4(a)(1)(A) (2013). She was subsequently sentenced to 365 days, entirely suspended to probation.

[11] On February 18, 2009, Buchanan filed an Amended Complaint. In part, Buchanan alleged that BGC violated its statutory and common law duty "to make sure that its employees did not become intoxicated during and after their employment by consumption of alcoholic beverages provided by [BGC], before they took to the streets on their way home from work." (Appellants' App. p. 13). On January 31, 2014, Buchanan filed a motion for partial summary judgment, contending that Vowell's actual knowledge of her own intoxication should be imputed to BGC as her employer. On February 28, 2014, BGC filed a cross-motion for summary judgment, arguing that BGC was not liable for the damages caused by Vowell's intoxication under either the Dram Shop Act or the common law because there is no evidence that BGC had actual knowledge that Vowell was visibly intoxicated at the time she was served an alcoholic beverage. On April 21, 2014, the trial court conducted a summary judgment hearing. On June 20, 2014, the trial court issued its Order, denying the parties' cross-motions based upon existing questions of material fact.

[12] BGC and Buchanan now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[13] On review of the grant or denial of summary judgment, our court applies the same standard as used by the trial court. *Merchants Nat'l Bank v. Simrell's Sports Bar & Grill, Inc.*, 741 N.E.2d 383, 386 (Ind. Ct. App. 2000). "Summary judgment 'should not be used as an abbreviated trial, even where the proof is difficult or where the court may believe that the non-moving party will not succeed at trial.'" *Pierson ex rel. Pierson v. Serv. Am. Corp.*, 9 N.E.3d 712, 715 (Ind. Ct. App. 2014), *trans. denied*. Thus, summary judgment is appropriate only "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). We must construe all facts and any inferences reasonably derived from those facts in favor of the non-moving party. *Id.* In doing so, we may only consider matters that were designated to the trial court during the summary judgment proceedings, and we make no determinations as to evidentiary weight or credibility. *Estate of Cummings v. PPG Indus., Inc.*, 651 N.E.2d 305, 307 (Ind. Ct. App. 1995), *reh'g denied, trans. denied*.

[14] The party moving for summary judgment bears the burden of proving the absence of a genuine issue of material fact. *Vanderhoek v. Willy*, 728 N.E.2d 213, 215 (Ind. Ct. App. 2000). Thereafter, the non-moving party must set forth specific facts showing the existence of a genuine issue of material fact. *Id.* We will find a genuine issue of material fact "where the facts concerning an issue that would dispose of the litigation are in dispute or where the undisputed

material facts are capable of supporting conflicting inferences on such an issue." *Id.* In addition, even if the material facts are undisputed, we will nevertheless find summary judgment to be inappropriate if the record reveals an incorrect application of the law to the facts. *Id.*

## II. *Dram Shop Liability Claim*

Indiana's Dram Shop Act "represents a legislative judgment that providers of alcoholic beverages should be liable for the reasonably foreseeable consequences of knowingly serving alcohol to visibly intoxicated persons." *Id.* At the time of the accident, Indiana Code section 7.1-5-10-15(a) (2004) (Dram Shop Criminal Provision) provided that "[i]t is unlawful for a person to sell, barter, deliver, or give away an alcoholic beverage to another person who is in a state of intoxication if the person knows that the other person is intoxicated."[2] In order to be held civilly liable for violating the Dram Shop Criminal Provision, Indiana Code section 7.1-5-10-15.5(b)(1) (Dram Shop Civil Provision) requires that a person who furnishes an alcoholic beverage to an intoxicated person must have "had actual knowledge that the person to whom the alcoholic beverage was furnished was visibly intoxicated at the time the alcoholic beverage was furnished."[3] To "'furnish' an alcoholic beverage, a

---

[2] Effective July 1, 2014, the Dram Shop Criminal Provision was amended to provide that "[a] person who, knowing that another person is intoxicated, sells, barters, delivers, or gives away an alcoholic beverage to the intoxicated person commits a Class B misdemeanor." I.C. § 7.1-5-10-15(a) (2014).

[3] Buchanan devotes a significant portion of his argument repudiating BGC's reference to the Dram Shop Civil Provision as an immunity statute. However, this court has previously referred to Indiana Code section 7.1-5-10-15.5 as an immunity provision. *See Thompson v. Ferdinand Sesquicentennial Comm., Inc.*, 637 N.E.2d 178, 180 (Ind. Ct. App. 1994). Furthermore, Indiana Code chapter 34-30-2 identifies various "[s]tatutes

defendant must be found to have possessed or controlled the alcoholic beverages consumed." *Vanderhoek*, 728 N.E.2d at 215. Also, the person's intoxication must have been a proximate cause of the death, injury, or damage alleged in the civil complaint. I.C. § 7.1-5-10-15.5(b)(2).

### A. *Appeal: Evidence of Visible Intoxication*

[16] BGC contends that it is entitled to summary judgment under the Dram Shop Act because there is no evidence to establish that it had actual knowledge of Vowell's visible intoxication "when [BGC] furnished her alcohol, or at any point that night." (Appellants' Br. p. 14). In determining whether the furnisher of alcohol had actual knowledge that he was furnishing alcohol to an intoxicated individual, "[t]he furnisher's knowledge must be judged by a subjective standard." *Delta Tau Delta, Beta Alpha Ch. v. Johnson*, 712 N.E.2d 968, 974 (Ind. 1999), *declined to follow on other grounds by Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048 (Ind. 2003). "Absent an admission that the person furnishing alcohol had actual knowledge of the other's intoxication, the trier of fact must look to reasonable inferences based upon an examination of the surrounding circumstances." *Id.*

> Actual knowledge of intoxication can be inferred from indirect or circumstantial evidence such as "what and how much the person was known to have consumed, the time involved, the person's behavior at the time, and the person's condition shortly after leaving." Where,

---

outside [Indiana Code title] 34 *[t]hat [c]onfer [i]mmunity*." (Emphasis added). The Dram Shop Civil Provision is included in this list. *See* I.C. § 34-30-2-23.

> however, there is insufficient evidence to support actual knowledge, the issue may be resolved as a matter of law.

*Id.* (internal citation omitted).

[17] There is no dispute that Vowell consumed at least two shots of vodka at BGC on the night of the accident, but a review of the designated evidence reveals no admission or testimony by witnesses that she was visibly intoxicated at any point during her shift. According to their depositions, the two BGC bartenders on duty that evening have no recollection of serving any alcohol to Vowell. Vowell averred in her deposition that after she consumed her end-of-shift drink, she felt fine to drive and nobody told her she should not drive. Shannon also believed Vowell was fit to drive herself. In *Delta Tau Delta,* the Indiana Supreme Court found that even assuming that a member of the fraternity had furnished the intoxicated person with alcohol, "there [was] no evidence that [he] exhibited visible signs of intoxication for a [fraternity member] to notice"— *i.e.*, the intoxicated person "may have been more talkative than usual, but he was not rowdy or stumbling or having verbal difficulties." *Id.* at 974-75. Similarly, in the present case, there is no designated evidence that Vowell exhibited any indicia of intoxication at the time she was furnished alcoholic beverages. She was not rowdy or boisterous, and she did not exhibit any typical signs of physical intoxication such as watery/bloodshot eyes, slurred speech, or unsteadiness in balance. *See Murdock v. Fraternal Order of Eagles*, 779 N.E.2d 964, 969 (Ind. Ct. App. 2002), *reh'g denied, trans. denied*.

[18]     BGC also relies heavily on its expert toxicologist, Dr. Michael McCabe (Dr. McCabe), who used reverse extrapolation to determine that Vowell's BAC at the time she was last furnished a drink would not have exceeded 0.063%. According to Dr. McCabe, the BAC threshold for visible intoxication is 0.15%. In particular, Dr. McCabe explained in his affidavit:

> The progressive impairing effects of alcohol (i.e., loss of inhibitions, followed by impaired judgment, followed by delayed reaction time, followed by loss of motor coordination) are a function of the sensitivity of the specific brain regions controlling these processes to alcohol.
>
> Although alcohol affects people differently, progressive impairment of these [central nervous system]-controlled activities has been associated with relatively well-defined BAC levels as indicated above. Visible signs of intoxication generally fall into the categories of delayed reaction time (e.g., slurred speech) and loss of motor coordination (e.g., staggering). Impairment in these activities has been associated with relatively well-defined BAC levels. Scientific studies have also established that visible signs of intoxication are present in the majority (i.e., more than 50%) of social drinkers at BACs of about 0.15%.
>
> There is no testimony or evidence that indicates that Vowell was visibly intoxicated while she allegedly was served a shot of Three Olives Cherry Vodka at [BGC], nor does Vowell's measured or calculated blood alcohol concentration predict that [s]he was visibly intoxicated at the time of service at [BGC]. Furthermore there is a discrepancy between Vowell's subjective recall of what she had had to drink and toxicological analysis of her alcohol dose. Accordingly, given the prolonged duration of time that elapsed between when Vowell fled the scene of the accident (i.e., 2 hours), there is no scientific reason that supports incorporating consumption of the additional drinks during the timeframe that she was served at [BGC] *versus* the time period she was at home.

(Appellants' App. pp. 246-47) (footnote omitted).

[19] The threshold for visible intoxication as being 0.15% is not specifically disputed by Buchanan's toxicology expert, Dr. Daniel McCoy, or any of his other designated materials. Nonetheless, whether or not the expert opinion of a toxicologist who has extrapolated BAC levels creates an inference as to the *subjective* knowledge of the BGC bartender who purportedly furnished alcohol to Vowell is a matter for the trier of fact. *See Booker, Inc. v. Morrill*, 639 N.E.2d 358, 362-63 (Ind. Ct. App. 1994) (finding the toxicologist's opinion that someone with a BAC of 0.21% would manifest physical signs of intoxication such as impaired balance and mental confusion constituted circumstantial evidence from which the trier of fact could conclude that the intoxicated person exhibited these signs of visible intoxication in the presence of the furnisher of alcohol).

[20] Moreover, despite Vowell's claim to have only consumed a 1.25-ounce shot at the beginning of her shift and a 2.5-ounce shot at the end of her shift, the undisputed toxicology evidence proves that she must have consumed more alcohol than she recalled to register a BAC of 0.10% to 0.128% within half an hour of leaving BGC. *See Pierson ex rel. Pierson*, 9 N.E.3d at 719 ("Ultimately, it is the role of the fact-finder, and not the court in summary judgment proceedings, to determine issues of credibility or relative weight of the evidence—for example, whether self-reporting of alcohol consumption was inaccurate or an expert opinion based upon a toxicology report was flawed."). In *Ward v. D & A Enterprises of Clark Cnty., Inc.*, 714 N.E.2d 728, 730 (Ind. Ct. App. 1999), the tavern argued that the intoxicated person consumed only one

beer on its premises and stated that it was unknown where he consumed sufficient alcohol to register a BAC of 0.22%. Our court found that it was the tavern's responsibility

> as the moving party to establish the non-existence of every material question of fact. . . . [A]s long as "it is unknown where [the intoxicated person] consumed alcohol sufficient to register a .22," [the tavern] failed to meet this responsibility. In the absence of designated evidence that [the intoxicated person] consumed the alcohol elsewhere, there is a material question of fact as to whether [the intoxicated] person consumed at [the tavern] which, on the basis of the designated material, is the only place [the intoxicated person] drank alcohol. Moreover, when viewed most favorably to the non-moving party, the fact that [the tavern] served even one beer to a person who shortly thereafter was in a state of serious intoxication gives rise to a question of fact whether [the intoxicated person] was visibly intoxicated at the time.

*Id.*

[21]    Dr. McCabe also posited several possible scenarios to explain how Vowell could have registered a BAC of 0.06% more than three hours after the accident: first, Vowell could have consumed only the two drinks at BGC as she claimed, and subsequently consumed additional alcoholic beverages between the time of the accident and the administration of her breathalyzer test; second, contrary to her sworn deposition, Vowell could have consumed more than two shots of vodka during her shift at BGC. Vowell stated in her deposition that she did not consume any alcohol prior to her arrival at BGC or after leaving BGC. Similar to the present case, in *Pierson ex rel. Pierson*, an individual struck a pedestrian with his vehicle following his consumption of alcohol at Lucas Oil Stadium. 9 N.E.3d at 714. Because the designated evidence was capable of supporting

several scenarios—that is, either the intoxicated person "drank before and during the game to the point where he would have exhibited signs of intoxication observable by the stadium volunteer selling him beer; [he] drank to excess only after leaving the stadium; or [he] was intoxicated inside the stadium but did not exhibit visible signs of intoxication"—we found that there was a genuine issue of material fact "as to whether a [stadium vendor] agent served [the intoxicated person] even a single drink with actual knowledge of his visible intoxication." *Id.* at 718-19.

[22] It is further undisputed that Vowell was involved in an accident shortly after leaving BGC, and her BAC exceeded the legal limit at the time of the accident. Also, Vowell's husband and Detective Wright each detected the odor of alcohol on Vowell's breath, respectively twenty minutes and two hours after the accident. In *Vanderhoek*, Terry Neil (Neil) was served at least three beers at the Fraternal Order of Eagles (FOE) and had not consumed any alcohol prior to his arrival at the FOE. 728 N.E.2d at 217. Although Neil did not exhibit any signs of intoxication while at the FOE, he was involved in an accident shortly after his departure. *Id.* At the time of the accident, the police officer observed a strong odor of alcohol on Neil's breath and noted that Neil's eyes were watery and bloodshot, his dexterity was slow, and he "exhibited unsteadiness in balance; slurred, confused, mumbling and profane speech; and an attitude characterized as angry and crying." *Id.* at 214. Neil also failed several field sobriety tests and registered a BAC of 0.15%. *Id.* Our court concluded that, based on these facts, "a trier of fact could reasonably infer that the FOE had

actual knowledge of Neil's intoxication at the time he was served." *Id.* at 217. Although Vowell did not fail any sobriety tests or exhibit any other indicia of visible intoxication, we find that whether it may be inferred from the BAC and the odor of alcohol that BGC had actual knowledge that Vowell was visibly intoxicated at the time she was furnished alcoholic beverages is a matter best left for the trier of fact. Therefore, we affirm the trial court's denial of summary judgment.

## B. *Cross-Appeal: Imputed Knowledge*

[23] On cross-appeal, Buchanan claims that the trial court erroneously denied his motion for partial summary judgment. Specifically, he insists that the "'actual knowledge of visible intoxication' . . . threshold exists for instances where a server/furnisher must judge the intoxication of *another* person." (Appellee's Br. p. 7) (emphasis added). Here, because the intoxicated person is an agent of BGC—*i.e.*, the alcohol furnisher—Buchanan argues that "the actual/subjective knowledge [Vowell] has as to her own level of intoxication is a given. It is what it is. It is tied to how much she knows she drank and when she drank it— whether or not she admits these facts." (Appellee's Br. pp. 6-7). According to Buchanan, BGC had actual knowledge of Vowell's visible intoxication because Vowell's "own knowledge of her personal level of intoxication while acting as a server for [BGC] must be imputed to [BGC] with each drink she consumed while on the clock." (Appellee's Br. p. 11).

[24] "Imputed knowledge is a tenet of agency law, and is based upon an underlying legal fiction of agency—the identity of principal and agent when the agent is

engaged in the principal's business." *Stump v. Ind. Equip. Co.*, 601 N.E.2d 398, 403 (Ind. Ct. App. 1992), *reh'g denied, trans. denied*. Imputed knowledge is premised upon another facet of agency law—the doctrine of respondeat superior. *Id.* In certain circumstances, respondeat superior confers liability upon an employer "'for the wrongful acts of his employee which are committed within the scope of employment.'" *Southport Little League v. Vaughan*, 734 N.E.2d 261, 268 (Ind. Ct. App. 2000) (quoting *Sword v. NKC Hosps., Inc.*, 714 N.E.2d 142, 147 (Ind. 1999)), *trans. denied*. Buchanan did not raise a claim of respondeat superior or vicarious liability in his Amended Complaint or motion for partial summary judgment, but he did seek a determination that Vowell's knowledge must be deemed imputed to BGC as her employer. On appeal, he argues that this court should declare, as a matter of law, that the "[k]nowledge of [Vowell] as to her own alcohol consumption while serving as an employee of [BGC], during the course of her employment and within the scope of her authority, is knowledge of [BGC], itself, regardless of whether [Vowell] shared her knowledge with anyone else." (Appellee's Br. p. 28).

[25] Under the rule of imputed knowledge, "the law imputes the agent's knowledge to the principal, even if the principal does not actually know what the agent knows." *Southport Little League*, 734 N.E.2d at 274. More specifically,

> knowledge of material facts acquired by an agent in the course of his employment, and within the scope of his authority, is the knowledge of the principal, and where no actual knowledge of the principal is shown, the rule will be given the effect on the theory of constructive knowledge, resting on the legal principle that it is the duty of the agent

> to disclose to his principal all material facts coming to his knowledge, and upon the presumption that he has discharged that duty.

*Id.* at 275. However, when an agent, acting within the scope of employment, "commits an independent tort for his own benefit," the principal must have "some knowledge or reason to know of the agent's conduct" before liability will attach pursuant to the imputed knowledge doctrine. *Id.*

[26] In the present case, the designated evidence reveals that the scope of Vowell's duties entailed ferrying alcoholic beverages to the customers as they ordered them and properly accounting for the beverages that were purchased. Paul Jersild (Jersild), the owner of BGC at the time of the accident, averred in his deposition that BGC's waitresses and bartenders were trained to recognize the physical signs of intoxication and were instructed to "not serve already intoxicated people." (Appellants' App. p. 82). Jersild also indicated that, with the exception of an end-of-shift drink, BGC's policy prohibited Vowell from consuming any alcohol during her shift. Based on the toxicologists' opinions, Vowell must have consumed more than two shots of vodka to register a BAC of 0.06% at 7:00 a.m.[4] Furthermore, there is evidence in the record indicating that Vowell had previously violated BGC's policy by becoming intoxicated during her shift and for which she was never reprimanded. Such a history of drinking on the job could create an inference that BGC had reason to know that Vowell

---

[4] Buchanan infers that Vowell was sneaking beverages for herself throughout her shift, whereas BGC contends that the evidence reveals only that BGC furnished Vowell with two drinks.

would consume alcohol during her shift so as to give rise to liability under the imputed knowledge doctrine.

[27] However, notwithstanding whether Vowell's knowledge should be imputed to BGC based on her past conduct, the designated evidence merely establishes that she did not have any knowledge of her own intoxication at the time she was last served a drink. Buchanan submits that Vowell knew she was intoxicated and fled from the scene of the accident out of fear that the police would recognize it as well. Yet, Vowell clarified that she believed she was "fine" to drive herself home, and she did not become concerned about her level of intoxication until after the accident when she learned from her husband that she "[reeked] of alcohol." (Appellant's App. pp. 45, 300). Vowell also explained that she did not realize what she had hit, and she was too afraid to stop because she had "heard of too many stories in general with . . . people putting stuff out [in the road] to make you stop because somebody is going to come and grab you out of your car." (Appellants' App. p. 161). Thus, at the time she was last furnished a drink, a question of fact remains regarding the knowledge of intoxication to be imputed to BGC. Therefore, Buchanan's partial motion for summary judgment was properly denied.

## II. *Common-Law Negligence Claim*

[28] In his Complaint, Buchanan also alleged that BGC was liable under the theory of common-law negligence. At the outset, we note that the parties disagree as to the applicability of the common law versus the Dram Shop Act. BGC argues that the "actual knowledge of visible intoxication" standard of the Dram Shop

Civil Provision also applies in a common-law claim for negligence because the statute plainly states that it "applies to *all* civil actions against persons who furnish alcoholic beverages to 'a person.'" *Thompson v. Ferdinand Sesquicentennial Comm., Inc.*, 637 N.E.2d 178, 180 (Ind. Ct. App. 1994) (emphasis added). As such, arguing that there is no evidence of actual knowledge of visible intoxication, BGC claims that it is entitled to summary judgment as to Buchanan's common-law claim. Alternatively, BGC contends that the Dram Shop Civil Provision preempts Buchanan's common-law negligence claim regarding the furnishing of alcohol. In turn, Buchanan posits that he has "a common law cause of action arising out of [BGC] providing alcohol to [Vowell] that is separate and distinct from any statutorily based cause of action." (Appellant's Br. p. 25) (relying on *Picadilly, Inc. v. Colvin*, 519 N.E.2d 1217 (Ind. 1988), and *Gariup Const. Co. v. Foster*, 519 N.E.2d 1224 (Ind. 1988)). We need not address whether the actual knowledge of visible intoxication standard applies in claims of common-law negligence or whether the common law is preempted by the Dram Shop Act because, independent of a claim arising from the furnishing of alcohol, we find that Buchanan can proceed under the common-law theory of negligent supervision.

[29]   In order to establish a claim of negligence, Buchanan must demonstrate (1) that BGC owed him a duty; (2) that BGC breached that duty; and (3) that the breach proximately caused his injury. *See Delta Tau Delta*, 712 N.E.2d at 970-71. In the case at hand, Buchanan seeks to hold BGC liable based on an

alleged breach of its duty to supervise Vowell's conduct. In particular, he asserts:

> Public policy must promote and encourage supervision of employees particularly when the dangers of driving when intoxicated are considered. Conversely, public policy must discourage (1) allowing employees to drink on the job; (2) failing to enforce "rules" against drinking on the job; (3) providing end of work drinks to employees who have been in control of and drinking the employer's alcohol product while on the job; and/or (4) giving to an employee at the end of a shift a single drink large enough to assure that once consumed the employee will be drunk.

(Appellee's Br. p. 25).

[30] To prevail on summary judgment, BGC "must show that the undisputed facts negate at least one element of [Buchanan's] cause of action." *Pierson ex rel. Pierson*, 9 N.E.3d at 714-15. Summary judgment "is 'rarely appropriate'" in negligence cases. *Id.* at 715 (quoting *Rhodes v. Wright*, 805 N.E.2d 382, 387 (Ind. 2004)). "This is because negligence cases are particularly fact sensitive and are governed by a standard of the objective reasonable person—one best applied by a jury after hearing all of the evidence." *Rhodes*, 805 N.E.2d at 387. However, whether a legal duty is owed by one party to another is generally a question of law for the court to determine. *Pierson ex rel. Pierson*, 9 N.E.3d at 715.

[31] In general, "[t]here is no duty to control the conduct of a third person to prevent his causing harm to another unless a special relation exists between the actor and the third person imposing a duty upon the actor to control the third person's conduct or a special relation exists between the actor and the other

which gives the other a right of protection." *Foster v. Purdue Univ. Ch., Beta Mu of Beta Theta Pi*, 567 N.E.2d 865, 871 (Ind. Ct. App. 1991) (citing Restatement (Second) of Torts, § 315), *trans. denied*. Indiana courts have previously recognized the relationship of master-servant "as imposing on the actor a duty to control the conduct of a third person." *Lather v. Berg*, 519 N.E.2d 755, 767 (Ind. Ct. App. 1988), *reh'g denied*. Accordingly, under negligent supervision, an employer may be liable if "an employee steps beyond the recognized scope of his [or her] employment to commit a tortious injury upon a third party." *Scott v. Retz*, 916 N.E.2d 252, 257 (Ind. Ct. App. 2009) (internal quotation marks omitted). The parties do not dispute that Vowell consumed alcohol while on BGC's premises and while on duty as an employee, and BGC's bartenders were responsible for dispensing the alcoholic beverages. *See Estate of Cummings*, 651 N.E.2d at 311. Because Vowell was subject to BGC's direction and control when she consumed alcohol during her shift, the employer-employee relationship gave rise to a duty for BGC to supervise or otherwise control Vowell's behavior.

[32]     "Although the existence of duty is a matter of law for the courts to decide, a breach of duty is usually a matter left to the trier of fact." *King v. Ne. Sec., Inc.*, 790 N.E.2d 474, 484 (Ind. 2003), *reh'g denied*. "Only where the facts are undisputed and lead to but a single inference or conclusion may the court as a matter of law determine whether a breach of duty has occurred." *Id.* In this case, the parties heavily dispute the amount of alcohol Vowell consumed at BGC and the extent to which BGC failed to implement/enforce procedures to

prevent its employees from becoming intoxicated on the job and subsequently causing injury to third parties. Because there is a genuine issue of material fact as to whether BGC breached its duty, we find that summary judgment was inappropriate on the issue of common-law negligence.

## CONCLUSION

[33] Based on the foregoing, we conclude that the trial court properly denied BGC's motion for summary judgment under the Dram Shop Act because there is a genuine issue of fact concerning whether BGC furnished alcohol to Vowell with actual knowledge that she was visibly intoxicated. The trial court also properly denied BGC's summary judgment motion as it pertains to the common law because there is a genuine issue of material fact as to whether BGC breached its duty to supervise Vowell's conduct during her shift. We further conclude that the trial court appropriately denied Buchanan's cross-motion for summary judgment because, even assuming the imputed knowledge doctrine applies, the designated evidence establishes that Vowell had no knowledge of her own level of intoxication to be imputed to BGC.

[34] Affirmed.

[35] Bailey, J. and Barnes, J. concur