RENDERED: JULY 1, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-1106-MR

MICHAEL J. MOORE, AS THE
ADMINISTRATOR OF THE ESTATE
OF TIMOTHY M. MOORE                                        APPELLANT

|             | APPEAL FROM FAYETTE CIRCUIT COURT |
|-------------|-----------------------------------|
| v.          | HONORABLE KIMBERLY N. BUNNELL, JUDGE |
|             | ACTION NOS. 17-CI-03858 AND 17-CI-03882 |

HANK INVESTMENTS, INC. d/b/a MALABU
PUB; LSZ, LLC d/b/a PADDOCK BAR & PATIO;
SMALL PLATES, LLC d/b/a SOUNDBAR;
SUZANNE M. WHITLOW; AND
JESSICA SCHWEITZER, INDIVIDUALLY
AND AS NEXT FRIEND TO HER MINOR
CHILDREN, AVERY SCHWEITZER AND
JACKSON SCHWEITZER, AND AS
EXECUTRIX OF THE ESTATE OF JASON
SCHWEITZER                                                 APPELLEES

AND

NO. 2020-CA-1110-MR

JESSICA SCHWEITZER, INDIVIDUALLY
AND AS NEXT FRIEND TO HER MINOR

CHILDREN, AVERY SCHWEITZER AND
JACKSON SCHWEITZER, AND AS
EXECUTRIX OF THE ESTATE OF JASON
SCHWEITZER, DECEASED                                        APPELLANT


APPEAL FROM FAYETTE CIRCUIT COURT
v.          HONORABLE KIMBERLY N. BUNNELL, JUDGE
ACTION NO. 17-CI-03858


HANK INVESTMENTS, INC. d/b/a MALABU
PUB; LSZ, LLC d/b/a PADDOCK BAR & PATIO;
SMALL PLATES, LLC d/b/a SOUNDBAR;
SUZANNE M. WHITLOW; AND
MICHAEL J. MOORE, AS THE
ADMINISTRATOR OF THE ESTATE
OF TIMOTHY M. MOORE                                        APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CALDWELL, MAZE, AND McNEILL, JUDGES.

CALDWELL, JUDGE:  The above-captioned appellants appeal the Fayette Circuit

Court's summary dismissal of dram shop claims they asserted against appellee

Hank Investments, Inc. d/b/a Malabu Pub & Grille ("Malabu").  Upon review, we

affirm.

# OVERVIEW

At 10:09 p.m. on Friday, October 28, 2016, Suzanne Whitlow ("Whitlow") ended her shift as a server at a Red Lobster in Lexington. She began drinking at Malabu perhaps an hour later. Near midnight on Saturday, October 29, 2016, she drove to another bar, the Paddock, where she met with friends and continued drinking. Afterward, she might have consumed drinks at other bars neighboring the Paddock; she could not recall. And, upon returning to her vehicle near 2 a.m., she also might have consumed one or more beers from a case of beer she kept behind the driver's seat; she could not recall. She then began driving home.

At or about 2:30 a.m., Whitlow lost control of her vehicle near South Upper Trace Road at Bolivar Street in Lexington, Kentucky. She veered onto the sidewalk, striking two pedestrians, Jason Schweitzer ("Schweitzer") and Timothy Moore ("Moore"), and crashed into a building. Whitlow exited her vehicle wearing only one shoe. As further noted by Lexington Police Department ("LPD") officers, she had a "strong odor of alcoholic beverages on her breath and person" and "exhibited very slurred speech and her ability to communicate was extremely choppy with her continued tangents and inability to string together continued coherent thoughts and explanations." *See Whitlow v. Commonwealth*, 575 S.W.3d 663, 666 (Ky. 2019). Investigators located the open case of beer behind the

-3-

driver's seat of her vehicle and an unopened can of beer on the floorboard in front of the driver's seat.  An assessment of blood drawn from Whitlow at 5:48 a.m. indicated that Whitlow's blood alcohol content (BAC) was .237.  Due to the accident, both Schweitzer and Moore died.  Whitlow was charged with, and ultimately convicted of, several offenses including misdemeanor driving under the influence and two counts of second-degree manslaughter.  *Id.* at 665.

Based upon the above, Jessica Schweitzer, on behalf of Schweitzer's estate and in her above-captioned capacities, filed suit in Fayette Circuit Court (No. 17-CI-03858) on October 26, 2017, against Whitlow for negligence and gross negligence; and against several entities, whose bars had allegedly contributed to Whitlow's intoxication prior to the accident, for dram shop liability and punitive damages.  Among those entities were LSZ, LLC, d/b/a Paddock Bar & Patio ("Paddock"); Small Plates, LLC, d/b/a Soundbar ("Soundbar"); and Hank Investments, Inc. d/b/a Malabu Pub & Grille ("Malabu").  Schweitzer also sued each defendant for wrongful death, loss of consortium, and punitive damages.

Michael J. Moore, as the administrator of Moore's estate, also filed suit in the same venue (No. 17-CI-03882) on October 28, 2017, against Whitlow for negligence and gross negligence and against the same above-described entities for dram shop liability and punitive damages.  Moore likewise sued each defendant for wrongful death, negligent infliction of emotional distress, and punitive

damages. Afterward, the circuit court consolidated Schweitzer's and Moore's actions for purposes of discovery.

The dram shop entities denied liability in their various answers and either crossclaimed or reserved the right to file crossclaims against Whitlow for indemnity. On August 10, 2020, following a period of discovery, the circuit court then summarily dismissed the appellants' claims against Malabu after concluding that no evidence had been adduced indicating that, at the time she was served at Malabu's bar, a reasonable person would have known Whitlow was intoxicated. These appeals were filed soon afterward and focus entirely upon the propriety of Malabu's summary judgments. Other facts will be provided as necessary in the context of the analysis.

## STANDARD OF REVIEW

Summary judgment serves to terminate litigation where "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR[1] 56.03. It is well established that a party responding to a properly supported summary judgment motion cannot merely rest on the allegations in his pleadings. *Continental Cas. Co. v. Belknap Hardware & Mfg. Co.*, 281 S.W.2d

---

[1] Kentucky Rule of Civil Procedure.

-5-

914 (Ky. 1955). "[S]peculation and supposition are insufficient to justify a submission of a case to the jury, and . . . the question should be taken from the jury when the evidence is so unsatisfactory as to require a resort to surmise and speculation." *O'Bryan v. Cave*, 202 S.W.3d 585, 588 (Ky. 2006) (citing *Chesapeake & Ohio Ry. Co. v. Yates*, 239 S.W.2d 953, 955 (Ky. 1951)). "'Belief' is not evidence and does not create an issue of material fact." *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990); *see also Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. App. 2007) ("A party's subjective beliefs about the nature of the evidence is not the sort of affirmative proof required to avoid summary judgment."). Furthermore, the party opposing summary judgment "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 481 (Ky. 1991) (internal quotation marks and citations omitted).

On appeal, we must consider the evidence of record in the light most favorable to the non-movant and must further consider whether the circuit court correctly determined that there were no genuine issues of material fact and that the moving party was entitled to judgment as a matter of law. *Scifres v. Kraft*, 916 S.W.2d 779 (Ky. App. 1996). "Because summary judgment involves only legal

-6-

questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue *de novo*." *Lewis v. B & R Corp.*, 56 S.W.3d 432, 436 (Ky. App. 2001) (footnote omitted).

## ANALYSIS

Before proceeding to the merits, it is necessary to clarify a misapprehension from the Schweitzer appellants regarding their cause or causes of action. They represent they asserted "three types" of dram shop claims against Malabu – a dram shop claim based upon "common law," one based upon KRS[2] 244.080, and a third based upon KRS 413.241. They complain the circuit court's summary judgment in favor of Malabu only considered the third of those claims, but ignored the first two.

To be clear, the Schweitzer appellants only asserted *one* dram shop claim; but their confusion is somewhat understandable. In Kentucky, dram shop claims were initially recognized under the common law in *Grayson Fraternal Order of Eagles, Aerie No. 3738, Inc. v. Claywell*, 736 S.W.2d 328 (Ky. 1987). There, borrowing the standard of care set forth in KRS 244.080(2), the Kentucky Supreme Court explained:

> This means that where there is evidence from which it can be reasonably inferred that the tavern keeper knows or should know that he is serving "a person actually or apparently under the influence of alcoholic beverages

---

[2] Kentucky Revised Statute.

-7-

(KRS 244.080(2))" and that there is a reasonable likelihood that upon leaving the tavern that person will operate a motor vehicle, the elements necessary to establish a negligence action are proved.

*Id*. at 334.

Shortly after *Claywell*, our General Assembly enacted KRS 413.241 – not as an *additional* type of dram shop action, but as a *limitation* upon any action against a dram shop. Indeed, the fact that KRS 413.241 is a limitation upon a cause of action, as opposed to the source of one, is readily apparent from its location in KRS Chapter 413 – a chapter of our statutes entitled "Limitation of Actions."

With that said, the purpose of Kentucky's dram shop statute, KRS 413.241, "is to simply protect the commercial interest of a business selling alcoholic drinks responsibly, while at the same time prohibiting it from making money by irresponsibly plying intoxicated people with drink who may – because of their intoxication – pose a hazard to others." *Fort Mitchell County Club v. LaMarre*, 394 S.W.3d 897, 900 (Ky. 2012) (citation omitted). Turning to the relevant portion of the statute, KRS 413.241 provides:

> (2) Any other law to the contrary notwithstanding, no person holding a permit under KRS Chapters 241 to 244, nor any agent, servant, or employee of the person, who sells or serves intoxicating beverages to a person over the age for the lawful purchase thereof, shall be liable to that person or to any other person or to the estate, successors, or survivors of either for any

> injury suffered off the premises including but not limited to wrongful death and property damage, because of the intoxication of the person to whom the intoxicating beverages were sold or served, unless a reasonable person under the same or similar circumstances should know that the person served is already intoxicated at the time of serving.
>
> (3) The intoxicated person shall be primarily liable with respect to injuries suffered by third persons.

In sum, if a dram shop (1) sells or serves intoxicating beverages to a person of lawful age; (2) at the time of sale or service, that person was already intoxicated; and (3) at the time of sale or service, a reasonable person under the same or similar circumstances should have known that the person was already intoxicated; (4) the dram shop will be secondarily liable for any injuries or property damage later caused off the premises by that person because of the intoxication. *See id*. Keeping this in mind, we will now address the propriety of the circuit court's summary judgments in favor of Malabu.

Recall, the accident giving rise to this litigation occurred at approximately 2:30 a.m. on October 29, 2016. The issue presented in these appeals is not Whitlow's level of intoxication shortly beforehand, when she may or may not have been drinking beer in her vehicle. Nor is it Whitlow's level of intoxication in downtown Lexington, where Whitlow drank an indeterminate amount of alcohol at one or more other bars over a two-hour period after leaving Malabu. Rather, the dispositive issue is Whitlow's level of intoxication at the time

-9-

she was served at Malabu – the place where she undisputedly began drinking three or four hours before causing the accident.

Granting summary judgment in favor of Malabu based upon the third dram shop element set forth above, the circuit court determined the appellants adduced no evidence supporting Malabu had served Whitlow when a reasonable person under the same or similar circumstances should have known she was already intoxicated. The appellants assert the circuit court erred in this regard because, in their view, reasonable evidentiary inferences could support Whitlow was already intoxicated when Malabu served her. Before proceeding to the specifics of the appellants' arguments, which largely overlap, it is necessary for context to summarize the extent of the evidence relating to Whitlow's visit to Malabu – evidence largely emanating from six different accounts given by five different witnesses.

Two of those accounts came from Whitlow herself. To summarize her December 12, 2019, deposition testimony, Whitlow stated that over the year preceding the accident, she visited Malabu "almost every day" after her shift ended, usually between 11 p.m. and 2 a.m. She would usually shoot pool and have three or four drinks. On October 28, 2016, after clocking out from Red Lobster at 10:09 p.m., and then stopping at a nearby Speedway station for gas and cigarettes, she arrived at Malabu, which was about two blocks away from her workplace. On

-10-

the date of her deposition, Whitlow could not recall exactly when she arrived at Malabu, explaining she may have stayed later at Red Lobster and that she could only guess how long she was at the Speedway. But, she testified she stayed at Malabu for "over an hour" after arriving; paid in cash; shot pool; purchased and drank one or two "single"[3] vodka and cranberry drinks; purchased a Budweiser beer and a Jägermeister or tequila shot about thirty minutes later; purchased a Jägermeister or tequila shot for her friend and coworker, Katherine Mitchell ("Kat"), who was already at Malabu when she arrived; and also had a cigarette with Kat.

Whitlow further testified that about twenty minutes after she and Kat drank their shots and she finished her beer, she left Malabu by herself, driving ten minutes away to the Paddock in downtown Lexington to meet two other friends, Jeremy Arvin and Sierra Hensley. Whitlow also reviewed text message data from her phone, and explained her texts indicated she probably left Malabu near 12:11 a.m.[4] All told, Whitlow believed she had three or four drinks at Malabu over the course of at least an hour.

---

[3] "Single" refers to a mixed drink containing one shot of hard liquor, as opposed to a "double" which contains two.

[4] Whitlow's text message data was detailed in the LPD's crash report as follows:

- 10:56:56 pm Jeremy tells Whitlow to "Come to sound bar
  please hangout here."

When asked about her level of intoxication at Malabu, Whitlow explained she would typically become "wobbly," "tipsy," unable to walk straight, and that she would slur her speech when drunk. But, she recalled feeling sober and exhibiting none of those symptoms during her visit. Likewise, nothing of record indicates Whitlow experienced any difficulties during her approximate ten-minute journey to the Paddock afterward; when asked if she had any problems driving or walking at that time, she testified: "No sir. I was fine."

As to her *second* account, Whitlow acknowledged discrepancies existed between what she related in her December 12, 2019 deposition, and what she had related earlier during her October 29, 2016 interview with an investigating LPD officer. The interview (of which Whitlow testified she had no recollection) occurred at 4 a.m. while Whitlow was confined to an emergency room hospital

---

- 11:27:46 pm Whitlow says "Well they have a cover and the drinks aren't as strong and it's more expensive and I didn't make that much money"
- 11:29:54 pm Jeremy says "5$ I'll get ur first drink to make it up."
- 11:33:43 pm Whitlow says "When Kat leaves I will"
- 11:56:32 pm Whitlow says "Im down for Paddock"
- 10/29/16 at 12:03:10 Whitlow says "ok I'm down for Paddock"
- 12:04:24 am Whitlow says "I'll be leaving here in like 10 min you still buying my first drink?"
- 12:11:23 am Whitlow says "On my way!"
- 12:30:19 am Whitlow says "I'm about to go back to malabu" and follows it up seconds later stating "The drinks aren't strong and it's not busy at all"

As an aside, Whitlow undisputedly did not return to Malabu after departing to the Paddock.

bed, suffering from injuries, and heavily intoxicated; again, blood drawn from her at 5:48 a.m. indicated she had a BAC of .237. According to the transcript, while most of what she related to the officer during the interview was unintelligible, Whitlow indicated she had been at Malabu for "probably about twenty-five minutes"; and that while she had been there, she had consumed "two vodka and cranberry drinks, one vodka cranberry shot."

Next, Whitlow's friend, Kat, was deposed on June 9, 2020. Kat and Whitlow had been friends for over three years prior to the accident, and she testified the two of them would regularly meet at Malabu for "a couple of drinks" after working at Red Lobster. Kat testified that on the evening of October 28, 2016, she arrived at Malabu sometime between 10 p.m. and 11 p.m., and was there about twenty or thirty minutes before noticing Whitlow had also arrived. Kat chatted with Whitlow, but she recalled sitting at the "front" of the bar and talking with other patrons while Whitlow spent the majority of her time at Malabu at the "back" of the bar shooting pool. Kat testified Whitlow later asked if she wanted to go with her to another bar downtown, that she declined the invitation, and that the two of them left the bar together and parted ways around "midnight-ish."

Kat had no memory of what or how much Whitlow drank at Malabu and did not recall if Whitlow had bought her a drink that night. When asked about Whitlow's level of intoxication at Malabu during that period, however, Kat

-13-

explained she was familiar with how Whitlow typically acted when drunk. She indicated Whitlow would act "funny" and "goofy," but that her behavior after consuming "a lot of alcohol" was not significantly different from what it was while she was sober. By way of example, Kat explained Whitlow enjoyed hugging people regardless of whether she was intoxicated. That aside, Kat testified if she had noticed Whitlow was intoxicated when the two of them were parting ways, she would not have allowed Whitlow to leave the bar.

Ashley Faulkner ("Faulkner"), Stephanie Conrey ("Conrey"), and Amanda Pfuelb ("Pfuelb"), the three bartenders who served patrons at Malabu from the evening of October 28, 2016, until early the next morning, also provided deposition testimony. Each was deposed over three years after October 28, 2016. Faulkner was uncertain of when Whitlow arrived or left, but estimated Whitlow was at Malabu for "maybe an hour or two." She recalled Whitlow wore a Red Lobster uniform at the time (*i.e.*, a black shirt bearing the logo of the restaurant, along with black pants). She had no memory of serving Whitlow, but she recalled Whitlow had been there with Kat and had ordered a drink from another bartender. She also remembered seeing notations in Malabu's "tab book" indicating Whitlow had purchased four "single" mixed drinks while there. The tab book did not indicate when Whitlow purchased the drinks, and Faulkner could only assume the four mixed drinks were either vodka and lemonade or vodka and cranberry juice,

-14-

Whitlow's usual choices. Faulkner had no specific recollection of seeing Whitlow consuming any drinks.

As an aside, there is no indication from the record that Whitlow purchased any drinks with a credit card or anything else that would have generated a point-of-sale record of a transaction. Faulkner also testified Whitlow usually paid in cash. When a customer immediately pays for drinks in cash, it is not recorded in the tab book. So, there was no way of knowing the total number of drinks Whitlow might have purchased at Malabu if Whitlow had used cash to purchase additional drinks before starting or after closing the tab.

When asked about Whitlow's level of intoxication at Malabu during that period, Faulkner testified her general practice – consistent with her training and fourteen years of experience as a bartender – was to measure intoxication through observation. In relevant part, she explained:

> Q: Okay. So, as a bartender at Malabu, how do you
> monitor customers for signs of intoxication?
>
> A: Just acting out of the ordinary. Like, some – it's
> different for different people, so some people may be
> loud or obnoxious, dancing around, they could be like,
> you know, bobbing their head or some people get angry,
> slurred speech – there's numerous things that would
> indicate if somebody was intoxicated. Or if they can't
> properly count back their money. Like, if they pay for
> something and they don't know how to give me back
> money from something they gave me or they can't sign
> their ticket and then they can't put the tip or the total or

-15-

do that correctly, then that's a sign of, to me, they're intoxicated.

Q: Is drink counting something that you also implement to monitor a customer for intoxication?

A: Well, I feel like everybody's got a different tolerance so it depends on the person.

Q: So then, you don't drink count or pay atten – that would be a "no" to my previous question?

A: No.  No, I don't go back and count how many drinks there are, I just determine by how they're acting and what they can tolerate.

. . .

Q: Would you agree that intoxication occurs gradually?

A: No.  I just think they could come in and already have been drinking somewhere else, or maybe they did some sort of drugs, or maybe they didn't eat a whole lot and then they're drinking, so it's kind of being hit all of a sudden sometimes.

Regarding what she specifically recalled of Whitlow's demeanor, Faulkner explained she was familiar with Whitlow, and that Whitlow was a frequent customer at Malabu who would have "just a couple of drinks here and there."  She testified Whitlow had mostly remained in the back of the bar by the pool table over the course of the night, but that she saw Whitlow in passing for a few minutes at the bar where they had a brief conversation.  She saw her again while collecting empty glasses at the pool table, where she observed Whitlow

-16-

talking with other patrons.  She testified that on each occasion, Whitlow "seemed fine" and spoke in "her usual voice."

Conrey, one of the other bartenders on duty at Malabu that night, also regarded Whitlow as a "regular."  She recalled Kat had arrived at Malabu shortly before Whitlow on Friday evening, and that Whitlow wore a Red Lobster uniform while there.  The only drink she recalled serving Whitlow, and the only drink she witnessed Whitlow consume, was the same drink Conrey testified Whitlow usually drank at Malabu – either a "single" vodka and lemonade or vodka and cranberry juice.  Conrey remembered making the drink for Whitlow shortly after Whitlow arrived; having a brief conversation with her as she made it; and that Whitlow did not pay immediately, but instead started a tab which Conrey noted in Malabu's tab book.  Whitlow then went to the back of the bar to shoot pool.

The next (and last) time Conrey saw Whitlow was when Whitlow and Kat were preparing to leave.  Conrey had no memory of when Whitlow ultimately left, but she recalled "closing out" Whitlow's tab beforehand, and that "it wasn't a very long tab at all."  Conrey also had no memory of the tab's specifics, but she recalled it indicated Whitlow had purchased more of "whatever vodka drink" Whitlow had ordered from her earlier.  Conrey insisted Whitlow's tab bore no indication that Whitlow purchased any beer or shots at Malabu, but conceded it was "possible for someone to come up to the bar, and just order a single drink, and

pay cash for it without including it on their tab." Conrey remembered that before Kat and Whitlow left, Whitlow said "goodbye" to her and, as per usual, gave her a hug.

When asked about Whitlow's level of intoxication at Malabu that night, Conrey's testimony was roughly the same as Faulkner's. Her general practice – consistent with her training and ten years of experience as a bartender – was to primarily measure intoxication through observation. Conrey also testified she had "cut" Whitlow "off" on one or two prior occasions after witnessing Whitlow exhibit signs of intoxication (*i.e.*, slurred speech, and body language Conrey described as "off"). That said, Conrey testified that upon leaving Malabu that night, Whitlow "was fine."

The third bartender on duty, Pfuelb, testified her recollection of Whitlow's visit to Malabu on October 28, 2016, was best reflected in the statement she provided LPD investigators a day or so after the accident. As summarized in the LPD crash report,

> Ms. Pfuelb reported she saw Ms. Whitlow in Malabu Pub the night of the collision with her friend "Cat" [sic]. She recalls seeing the news coverage and realizing she had been in the pub. She says she knows her to work at Red Lobster and knows her as "Suzie". Pfuelb says "Suzie" was in Malabu Pub from approximately 11pm until about 12 am. She personally served her one vodka and lemonade and saw her coworker serve her another vodka and lemonade. Pfuelb says when "Suzie" closed out her

tab she had a total of four drinks on there; she does not know what the other two were. Whitlow paid in cash.

In her deposition, Pfuelb testified Whitlow may have come to Malabu at "10:45-ish," and she recalled briefly chatting with Whitlow about how Whitlow had just gotten off work. She recalled Whitlow wore a Red Lobster uniform that evening and mostly shot pool while she was there. Pfuelb also reiterated seeing four drinks on Whitlow's tab, but she did not know if Whitlow had purchased the drinks for herself or someone else.

When asked about Whitlow's level of intoxication at Malabu that night, Pfuelb's testimony was roughly the same as Conrey's and Faulkner's. She did not keep a strict drink count of every patron, and she explained that every person is unique and has differing levels of alcohol tolerance. Instead, Pfuelb's general practice – consistent with her training and twelve or so years of experience as a bartender – was to primarily measure intoxication through observation. In that vein, she testified:

> Slurred speak [sic] is probably one of the most common. You look for, you know, in the eyes whether they're watery, glassy, bloodshot. You look for, you know, whether their – their steps are faltering, if they're, you know, stumbling over themselves. Also, people's behavior gets heightened, you know, your sense of emotion, whether you're happy, you get even louder and happier. Your hand gesturing is another thing. Sadness, people crying, anger is another thing. Just basically emotions, I think, in general are heightened.

Pfuelb was also familiar with Whitlow, whom she deemed a "regular," and she described her as having a "nice personality," and being "very friendly" and "always polite." When asked how Whitlow appeared as she was closing out her tab before leaving Malabu that night, Pfuelb testified: "She was fine. There was no slurred speech. There was [sic] no indicators that she seemed intoxicated or inebriated. There was nothing that sent any type of red flag up that she was under the influence."

Having discussed the evidence of Whitlow's visit to Malabu, we now turn to the specifics of the appellants' arguments regarding the inferences that could be drawn from it to support Whitlow was "already intoxicated," per KRS 413.241(2), when Malabu served her. For their first argument, the appellants begin by noting Whitlow stated during her post-accident interview with LPD that she had been at Malabu for "twenty-five minutes." They assert it could be inferred Whitlow consumed more than seven drinks in that period. The appellants argue that this inference,[5] combined with fact that Whitlow's BAC (as measured from blood drawn from her at 5:48 a.m. the next day) was .237, could support an

_____

[5] Without citing the record, the appellants insist it could also be inferred Whitlow drank more than seven drinks "on an empty stomach." To the extent it is relevant, this is not reasonable inference, but rather speculation. Whitlow's deposition provides the only indication of whether Whitlow had food before arriving at Malabu. There, Whitlow testified *she could not recall* whether she ate at Red Lobster during or at the end of her shift on October 28 prior to arriving at Malabu, but that "most of the time when [she] got off work, [she] would stay there and [she] would eat because [Red Lobster employees] got like half off if we worked that day."

-20-

additional inference; namely, that Whitlow was already intoxicated on at least one of those seven possible occasions when Malabu might have served her.

As to how they reached a figure of "more than seven drinks," the appellants note each of the bartenders indicated Whitlow's drink tab indicated Whitlow *purchased* four "single" mixed drinks, but that her tab might not have reflected all of what Whitlow purchased if she had been using cash. They also note Whitlow only used cash; that she testified consuming a beer and a shot of tequila or Jägermeister in addition to possibly two mixed drinks at Malabu; and that she recalled, during her post-arrest interview, having a "vodka cranberry shot" at Malabu. Accordingly, the appellants' math is as follows: four mixed drinks listed on her tab, plus the beer and shot Whitlow mentioned in her deposition, plus the "vodka cranberry shot" she mentioned while in the hospital, equals *seven*. And, they add, it could have been *more* than seven, or perhaps less, because the bartenders at Malabu testified they did not use a measuring device called a "jigger" when pouring liquor, and instead "free-poured" liquor, which they measured through a counting method.

There are at least two problems with this chain-of-inferences argument. First, while recollections of what Whitlow drank at Malabu differed, no witness or other source of evidence indicated Whitlow was served more than four drinks there. Second, and more importantly, this argument necessarily relies upon

-21-

an impermissible assumption rather than evidence, *i.e.*, that all people who drink a certain amount will, more probably than not, become perceptibly intoxicated within a certain amount of time.

As to why this assumption is impermissible, the General Assembly has indicated through use of the "reasonable person" standard in KRS 413.241(2) that determining whether a given dram shop or its agents "should know that the person served is already intoxicated at the time of serving" within the meaning of the statute is an inherently objective inquiry, and one of degree. *See also Wilson v. Commonwealth*, 628 S.W.3d 132, 143 (Ky. 2021) (generally explaining the "reasonable person" standard). As Malabu notes in its brief, the statute does not hold a dram shop and its employees to the standard of a reasonable *toxicologist* or a reasonable *behavioral psychologist*. Rather, it "imposes a duty upon a dram shop and its employees, before selling or serving alcohol to a person, to use their powers of observation to perceive readily visible warning signs that a person is intoxicated, and to refrain from serving or selling alcohol to that patron." *Carruthers v. Edwards*, 395 S.W.3d 488, 492 (Ky. App. 2012).

In this respect, our Supreme Court provided further guidance in *LaMarre*, 394 S.W.3d 897. There, Timothy LaMarre sued the Fort Mitchell Country Club for alleged negligence in over-serving alcohol to Michael Plummer, who had injured him while operating a golf cart shortly after the two of them

-22-

departed the club together. LaMarre asserted the club was not entitled to the immunity from suit provided by KRS 413.241(2) because, in his view, the club had continued to serve Plummer alcohol after it was apparent Plummer was intoxicated. *Id*. at 899. Eventually, LaMarre's action was summarily dismissed and, following its review of LaMarre's evidence, our Supreme Court agreed with the summary disposition.

In its opinion, the Court focused upon the objective evidence of Plummer's condition and what the club and its agents witnessed of Plummer's condition before, during, and shortly after an approximate 70-minute time span – a time span in which Plummer and his wife shared dinner with LaMarre and his wife at the club. The Court noted the evidence of whether Plummer actually was intoxicated at any point in time was unclear – nothing indicated his BAC was ever measured, and the quantity of alcohol Plummer imbibed was unknown. At most, the evidence demonstrated Plummer shared an unspecified amount of two bottles of wine with LaMarre and his wife during dinner. *Id*. at 901.

Even assuming Plummer had been intoxicated, however, the Court emphasized the "ultimate issue" presented did "not deal with the *actual* inebriation of Mr. Plummer, but whether a 'reasonable person' should know that the person being served alcohol is intoxicated." *Id*. (emphasis added). Accordingly, while LaMarre argued summary judgment was premature because he should have been

permitted more time in discovery to adduce expert testimony from a toxicologist, the Court rejected the notion, explaining "the toxicologist would not have been able to speculate as to Mr. Plummer's actual blood alcohol level or as to the ultimate issue – how Mr. Plummer *appeared* to the Club's employees during the night of the incident." *Id*. (emphasis added).

The *LaMarre* Court also explained the only evidence illustrating Plummer's perceptible condition during the relevant time frame presented no genuine issue of fact. Apart from noting there was no indication that Plummer so much as slurred his speech that evening, *id*. at 901, the Court observed:

> [F]ive separate employees of the Club spoke to the LaMarres and the Plummers. The two couples were familiar and regular members of the Club. All of the employees had received training in the detection of intoxicated customers. None of them believed that any member of the group was intoxicated. The LaMarres also indicated that they did not think Mr. Plummer was intoxicated when they left the Club that evening.

*Id*. at 899.

In sum, *LaMarre* provides the following about the quantum of evidence required to prove whether a given dram shop or its agents "should know that the person served is already intoxicated at the time of serving" within the meaning of KRS 413.241(2). While circumstantial evidence may suffice to

-24-

establish a person was perceptibly intoxicated at the relevant time,[6] it must nevertheless be actual evidence of the *perceptible* intoxication of the allegedly intoxicated person. Thus, as the Court indicated, a person's BAC cannot be considered a readily visible warning sign that a person is "already intoxicated" because it does not *show* what behavior, if any, the person actually manifested to a reasonable observer, nor how he or she appeared at any given time. As an aside, this policy is consistent with the licensing statutes, which do not concern themselves with the problem of individuals becoming intoxicated outside the presence of licensed alcohol vendors. *See, e.g.*, KRS 244.080(2).[7]

---

[6] While there seems to be some confusion on this point among the parties, interpreting KRS 413.241 as requiring only *direct* evidence of perceptible intoxication would improperly add language to the statute.

[7] KRS 244.080 provides in relevant part:

> A retail licensee, or the licensee's agent, servant, or employee, shall not sell, give away, or deliver any alcoholic beverages, or procure or permit any alcoholic beverages to be sold, given away, possessed by, or delivered to:
>
> . . .
>
>> (2) A person who *appears* to a reasonable person to be actually or apparently under the influence of alcoholic beverages, controlled substances, other intoxicating substances, or any of these substances in combination, to the degree that the person may endanger any person or property, or unreasonably annoy persons in the vicinity.

(Emphasis added.)

-25-

Here, any inference – plausible or not – that Whitlow consumed more than seven drinks at Malabu might reinforce a finding that she *was* intoxicated at or near the relevant time frame. But standing alone, it cannot substitute for showing in the first instance that she was *perceptibly* intoxicated. By extension, the same holds true regarding the amount of time Whitlow spent drinking at Malabu; the condition other hypothetical drinkers might have been in, had they consumed as much; instances of Whitlow's intoxication weeks or months earlier;[8] or the fact that over five hours after leaving Malabu, Whitlow's BAC was .237. None of that is the requisite evidence of Whitlow's *appearance* or *demeanor* at or near the relevant time, and it is not enough to overcome a motion for summary judgment.

For their second argument, the appellants assert Whitlow displayed an outward sign of intoxication by hugging Conrey before leaving Malabu. We disagree. Whitlow's hug occurred after Malabu stopped serving her; and, taking it in context, it would be speculation to say it circumstantially indicated Whitlow was intoxicated when she was served at Malabu sometime earlier. According to Kat, Whitlow enjoyed hugging people regardless of whether she was intoxicated.

---

[8] The appellants characterize Whitlow as an "habitual drunkard," emphasizing she was considered a "regular" at a bar, and that over a year prior to the October 29, 2016 accident, she was convicted of driving under the influence of alcohol. They also emphasize Whitlow posted sixteen one-sentence comments to her Facebook account between November 2015 and July 2016 expressing her enjoyment of alcohol. These details are irrelevant.

According to Conrey, Whitlow usually hugged her when leaving Malabu. And, while there is no evidence describing what the hug looked like, no one who witnessed it regarded Whitlow's hug or other conduct as abnormal.

Third, the appellants take issue with the testimony of Malabu's three bartenders who agreed Whitlow was "fine" and did not appear intoxicated. They argue a factfinder could disregard this testimony; first on grounds of bias and, they assert, because the bartenders were improperly trained and improperly failed to keep a record of every drink served to every patron over the course of Whitlow's visit. However, the burden of proof in this matter belonged to the appellants, not Malabu; and the hope that a factfinder will disbelieve an opponent's evidence is not enough to overcome a motion for summary judgment. *Steelvest, Inc.*, 807 S.W.2d at 481.

Fourth, the appellants accuse Malabu of spoliating evidence, and argue they were accordingly entitled to an evidentiary inference that Whitlow appeared outwardly intoxicated at Malabu. Specifically, they note that during discovery, Malabu failed to produce: (1) its "tab book," which the bartenders testified indicated Whitlow had purchased four "single" mixed drinks while at Malabu; and (2) surveillance footage from the time frame of Whitlow's visit.

At the onset, we note spoliation can warrant a "missing evidence" instruction, but that no Kentucky authority currently indicates whether an inference

arising from spoliation can overcome a motion for summary judgment. However, assuming the law of spoliation also applies in this context, there is no *entitlement* to an evidentiary inference stemming from alleged spoliation. Rather, "[i]t is within the trial court's discretion to deny a requested instruction, and its decision will not be reversed absent an abuse of discretion." *Auslander Properties, LLC v. Nalley*, 558 S.W.3d 457, 469 (Ky. 2018) (citation omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citations omitted). Regarding when such an inference is warranted:

> The latest word on missing evidence instructions came just a few months ago, in *Norton Healthcare, Inc. v. Disselkamp*, 600 S.W.3d 696 (Ky. 2020), where the Supreme Court said:
>
> > While we acknowledge that parties in civil litigation must not destroy evidence the parties know is relevant to potential litigation, we do not agree . . . that a party is always entitled to a missing-evidence instruction, to uphold "judicial integrity," in all cases where evidence is not available after the party responsible for the evidence was put on notice of potential litigation.
>
> *Id*. at 733 (footnote omitted).
>
> Relying, in large part, on *University Medical Center, Inc. v. Beglin*, 375 S.W.3d 783 (Ky. 2011), the Supreme Court further stated:

[T]he trial court is within its discretion to give a missing-evidence instruction when: (1) the evidence is material or relevant to an issue in the case; (2) the opponent had "absolute care, custody, and control over the evidence;" (3) the opponent was on notice that the evidence was relevant at the time he failed to produce or destroyed it; and (4) the opponent, "utterly without explanation," in fact failed to produce the disputed evidence when so requested or ordered. In so finding, we [noted] . . . that "nonproduction alone 'is sufficient by itself to support an adverse inference even if no other evidence for the inference exists[.]'"

*Disselkamp*, 600 S.W.3d at 731 (footnotes omitted). "In fact," said the Supreme Court, "the *Beglin* court explicitly declined to adopt 'a special rule for measuring the quantum or quality of evidence that will authorize a missing evidence instruction.' [*Beglin*, 375 S.W.3d] at 790. Instead, the *Beglin* court opted for a flexible standard that grants wide discretion to the trial court." *Id*. at 730 n.112. We keep these flexible standards in mind as we assess whether the circuit court abused this wide discretion in denying the missing evidence instruction.

*Curtis v. Price Holdings, Inc.*, 610 S.W.3d 339, 346 (Ky. App. 2020).

Keeping that in mind, we turn to why the circuit court declined giving the appellants an evidentiary inference. During the August 4, 2020 summary judgment hearing, it was observed that the appellants did not send Malabu any notice to preserve evidence until Moore's counsel sent Malabu a preservation letter on or about September 26, 2017. Regarding the tab book, Malabu offered no

explanation regarding its whereabouts other than that it must have been lost during the intervening eleven months. It noted, however, that the LPD crash report indicated Pfuelb's recollection days after the accident that the tab book reflected Whitlow had purchased four drinks.

Before ruling upon Malabu's motion for summary judgment, the circuit court explained the record did not indicate Malabu intentionally or willfully destroyed the tab book. Nevertheless, the circuit court also considered Pfuelb's recollection of the tab book's contents and indicated that even if the tab book represented that Whitlow purchased four drinks, it was insufficient for summary judgment purposes because it did not indicate how Whitlow appeared or acted at Malabu. Considering what we have discussed in this Opinion, we cannot say the circuit court abused its discretion or otherwise erred in this respect.

Regarding Malabu's surveillance footage, none of the three bartenders deposed in this matter recalled seeing any surveillance footage from the night in question,[9] and Malabu represented nothing existed. Its corporate representative, Henry Wilson, testified that upon learning of the accident a few days after it happened, he tried reviewing Malabu's system for footage of Whitlow from that

---

[9] Pfuelb testified she could not recall seeing any such footage. Faulkner testified being aware that a surveillance system existed; but that she had never tried accessing it and had never "seen anyone be able to rewind the video to go back to a different point in time." Conrey likewise testified having no knowledge of footage from that night, and that she had only ever attempted to access the newer system.

night, but discovered at that time that the system did not function. He testified that "sometime later" – between then and possibly after the underlying litigation was filed – he decided to have a new surveillance system installed. He testified Malabu no longer had possession of the old system, which he assumed had been disposed of by the company that had installed the new one. Wilson also provided the contact information of the individual who had installed Malabu's new surveillance system, but nothing of record indicates that individual was later contacted by the appellants.

Considering this evidence, the circuit court indicated during the summary judgment hearing that Malabu's lack of surveillance footage did not appear to have stemmed from a willful intent to destroy evidence. From all appearances, the circuit court's decision was founded upon the proposition that Malabu's lack of footage owed more to ordinary negligence and was not "utterly without explanation[.]" *Disselkamp*, 600 S.W.3d at 731. Considering the circuit court's "wide discretion" relative to missing evidence issues, *Curtis*, 610 S.W.3d at 346, we find no error in this respect, either.

The appellants' fifth argument is that it could be circumstantially inferred from evidence of Whitlow's conduct and appearance after leaving Malabu that she was perceptibly intoxicated while she was at Malabu. In that regard, they note that evidence demonstrates Whitlow was, without dispute, visibly intoxicated

at or about 2:30 a.m. on October 29, 2016, at the scene of the accident, and at 4 a.m. during her interview with LPD.

We disagree. As a general matter, evidence of an individual's later appearance or conduct can provide circumstantial evidence of earlier perceptible intoxication; however, temporal proximity is a chief consideration in determining its relevance. For example, it was held in *Tate v. Borton*, 272 S.W.2d 333 (Ky. 1954), that for purposes of a (now-outdated) contributory negligence defense, whether the decedent "voluntarily rode in the car knowing that the driver was under the influence of intoxicants" was a jury question. In *Tate*, notwithstanding eyewitness testimony supporting that the driver was "not drunk" before and after the car accident, the decedent witnessed the driver drinking shortly before entering the vehicle; the accident occurred shortly thereafter; and neither the driver nor any other witness could explain how the driver lost control of the vehicle and caused the fatal crash. *Id*. at 334. Here, by comparison, no such inference is reasonable. Whitlow's accident did not occur shortly after she was observed drinking at Malabu. The accident occurred two-and-a-half hours later and, during that period, Whitlow consumed an additional, undefined amount of alcohol.

Sixth, and finally, the appellants argue that approximately thirteen minutes of surveillance footage – recorded at the Paddock shortly after she arrived

there, and perhaps[10] fifteen or twenty minutes after she left Malabu –

circumstantially indicates she was visibly intoxicated at Malabu. We disagree,

however, that it depicts "readily visible signs" that Whitlow was intoxicated.

*Carruthers*, 395 S.W.3d at 492.

To summarize, the footage depicts activity at one of the Paddock's bar

tables. A female bartender can be seen working behind the bar. Approximately

seven patrons, sitting in a long row of chairs across from the bar, are facing the

bartender. Due to the camera angle, usually only the backs of their heads are

visible. Whitlow enters the bar and gives one of the individuals seated at the bar a

brief hug. From all accounts, the individual is her friend, Sierra Hensley. Whitlow

stands at the bar between Sierra and the woman seated to the right of Sierra.

Whitlow appears to greet and converse with the woman to the right and she places

her right hand on the back of the woman's chair. Whitlow then appears to order

what she would later testify was a vodka and cranberry juice mixed drink. The

bartender makes the drink and hands it to Whitlow. Whitlow looks through her

small purse (with no obvious difficulty, contrary to what the appellants represent)

and hands something unidentifiable to the bartender. Whitlow then sips her drink

through a straw.

---

[10] The Paddock provided approximately five hours and twenty minutes of surveillance footage, but the footage did not indicate when it was recorded. The Moore appellants estimate Whitlow arrived at the Paddock "around 12:23 a.m."

From all indications, there is loud music playing at the Paddock. Sometimes, people walking in and out of the footage lightly dance, gyrate, or shake their heads to the music, while standing in place, holding their drinks. On occasion, while standing at the bar, Whitlow does this, too. Over the course of the next few minutes, Whitlow sometimes places her hand on the back of the woman's chair. But there is no obvious indication – contrary to the appellants' assertions in their respective briefs – that she used the chair to brace herself in an effort to remain standing. For a brief moment, Whitlow also laughs with the woman and "high-fives" her. But it is quite an exaggeration to characterize the "high-five" as "sloppy," or causing her to "nearly fall over," as the appellants allege.

As the woman sitting next to Sierra gets out of her seat and leaves the footage, Whitlow takes her seat. For the next few minutes, for the most part, only Whitlow's back and the back of her head are visible. She converses with Sierra, occasionally gesticulating. Sometimes, she rests her right elbow on the bar. While doing that, she sometimes rests the side of her head in her open right hand. Sometimes, she holds the back of Sierra's chair with her left hand.

Ten minutes after arriving, Whitlow then leaves her seat, holding her drink and what appears to be her purse in her left hand, and walks, without difficulty, out of the footage. From all appearances, Whitlow is able to converse, is aware of her surroundings, and her conduct is unremarkable. Succinctly, there is

nothing in the video to support Whitlow was intoxicated at that time, or to support a reasonable person at Malabu being able to discern that Whitlow was intoxicated during her earlier stint at Malabu.

## CONCLUSION

We have addressed the breadth of the appellants' arguments. We have found no instance of error. Accordingly, we AFFIRM.

MᴄNEILL, JUDGE, CONCURS.

MAZE, JUDGE, DISSENTS AND FILES SEPARATE OPINION.

MAZE, JUDGE, DISSENTING: I cannot agree with the majority herein that the Appellants failed to adduce sufficient evidence to survive Appellees' motion for summary judgment. When the Court properly considers the summary judgment standard of CR 56.03, including its obligation to view the record in favor of the non-moving party, resolving all doubts in that party's favor, it is clear that sufficient evidence has been presented to demonstrate the existence of genuine issues of material fact. The majority has relied upon the case of *Fort Mitchell Country Club v. LaMarre*, 394 S.W.3d 897, 900 (Ky. 2012). However, that case is distinguishable since the Court concluded that there was a "total absence" of proof that the driver therein was intoxicated.

Such is not the case herein. In fact, a great deal of evidence was submitted as to the issue of whether a "reasonable person" should know that

-35-

Whitlow was intoxicated while at the Malabu bar. KRS 413.241. The testimony of Whitlow and the three bartenders varied widely as to the period of time she spent in the bar, the amount of alcohol which she purchased, and the amount of alcohol which she actually consumed. Whitlow testified that she was not intoxicated, and the bartenders all testified that she seemed "fine." However, the Appellants produced a video recorded minutes later at the Paddock, arguing that it shows her leaning on a chair, being somewhat boisterous and being slumped over the bar. This evidence was clearly probative of the issue of what a reasonable person knew or should have known as to her level of intoxication. Further, had the matter progressed beyond the summary judgment stage, Appellants may have had the benefit of expert testimony, as experts had not yet been disclosed prior to the entry of judgment. Finally, Appellants could well have been entitled to the benefit of a spoliation or missing evidence instruction along with the appropriate inferences arising out of Malabu's failure to retain the bar's video from that night and to safeguard the tab book which reflected drinks purchased.

Iowa's Dram Shop Act[11] is similar to Kentucky's in that it contains a requirement that the server must have "known or should have known" that the patron who inflicted the injury was intoxicated at the time of service. In *Smith v. Shagnasty's Inc*., 688 N.W.2d 67, 75 (Iowa 2004), the trial court granted the bar's

_____

[11] Iowa Code § 123.92.

motion for summary judgment and the Court of Appeals affirmed. On appeal, the

Supreme Court of Iowa reversed and remanded on the grounds that there were

genuine issues of material fact as to whether the server knew or should have

known that the bar patron was intoxicated. In so doing, the Court held that

circumstantial evidence is not only a sufficient element to show scienter but may

be sufficient without any direct evidence. In so doing, the Court quoted *Ward v. D*

*& A Enters. Of Clark County, Inc.*, 714 N.E.2d 728, 730 (Ind. App. 1999), which

held that:

> when viewed most favorably to the non-moving party,
> the fact that [a bar] served even one beer to a person who
> shortly thereafter was in a state of serious intoxication
> gives rise to a question of fact whether [the intoxicated
> person] was visibly intoxicated at the time [of service].

In *Torrance v. Murphy's Grill*, 884 N.W.2d 223, 2016 WL 1680470

(Iowa Apr. 27, 2016), where the Court affirmed the trial court's granting of

summary judgment, that the court had the benefit of expert testimony as to the

blood alcohol level of the patron. However, in the case before this Court, no

experts had been disclosed prior to the entry of summary judgment. While expert

testimony in this regard is not required, its absence should be a consideration in

determining if summary judgment has been awarded prematurely.

More importantly, the *Torrence* case also deals with an allegation of evidence lost or destroyed in the form of video from the bar and receipts from the day of the accident. The Court stated that:

> [T]he intentional destruction of or the failure to produce documents or physical evidence relevant to the proof of an issue in a legal proceeding supports an inference that the evidence would have been unfavorable to the party responsible for its destruction or nonproduction. The nonproduction, alteration, or destruction of evidence is commonly referred to as spoliation. When established, the inference is regarded as an admission by conduct of the weakness of the party's case.
>
> *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 718 (Iowa 2001) (citations omitted). The inference "is not warranted if the disappearance of the evidence is due to mere negligence, or if the evidence was destroyed during a routine procedure." *Id*. at 719.

*Id*. at *3.

Similarly, in *University Medical Center v. Beglin*, 375 S.W. 3d 783, 792 (Ky. 2011), the Supreme Court of Kentucky held that a missing evidence or adverse inference instruction may be given "when it may be reasonably believed that material evidence within the exclusive possession and control of a party, or its agents or employees, was lost without explanation or is otherwise unaccountably missing, the trier of fact may find that the evidence was intentionally and in bad faith destroyed or concealed by the party possessing it and that the evidence, if available, would be adverse to that party or favorable to his opponent." I

acknowledge that this is an evidentiary decision to be made at a later time by the trial court. However, I reiterate that summary judgment was entered prematurely in this case.

Finally, courts in other jurisdictions, most notably Indiana, have made clear statements of law that both indirect and circumstantial evidence and the inferences to be drawn therefrom are appropriate considerations as to the issue of intoxication. Admittedly, Indiana's Dram Shop statute differs from Kentucky's in that the former requires the server to have "actual knowledge" of "visible" intoxication. In fact, while such a standard would seem to impose a need for a higher quantum of evidence, Indiana courts have not so interpreted it.

In *BGC Entertainment, Inc. v. Buchanan*, 41 N.E.3d 692, 698 (Ind. App. 2015), the court held that, in the absence of a server's admission, circumstantial evidence is appropriate to determine "actual knowledge." The court in *Booker, Inc. v. Morrill*, 639 N.E. 2d 358, 362 (Ind. App. 1994), noted that the trier of fact could determine whether or not to believe the denials of the bartenders as to the driver's state of intoxication. Indeed, in *BGC*, *supra*, the Court likewise found that it is for the fact finder to determine the weight and credibility of the evidence and thus not appropriate for the court in summary judgment proceedings. Surely, this is also the analysis applicable to summary judgment proceedings in

Kentucky today, *see James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Company*, 814 S.W.2d 273 (Ky. 1991).

Although it is clearly not a Dram Shop case, I find the case of *Ogden v. Employers Fire Insurance Company*, 503 S.W.2d 727, 729 (Ky. 1973), to be instructive as to the use of circumstantial evidence and its effect upon the entry of summary judgment. Summary judgment was granted in favor of an uninsured motorist insurer based upon the trial court's finding that there was no evidence of contact between two vehicles in an auto accident. On appeal, the Court reversed, holding that while the direct and circumstantial evidence may have been "weak," contact could reasonably have been inferred from it. The Court noted the obligation of the trial court to consider the evidence and the inferences to be drawn from it most favorably to the non-moving party and leave issues of the weight and credibility for the jury. As stated in *Embs v. Pepsi-Cola Bottling Company of Lexington, Kentucky, Inc.*, 528 S.W.2d 703, 706 (Ky. 1975), "It matters not that the evidence be circumstantial for as Thoreau put it 'Some circumstantial evidence is very strong, as when you find a trout in the milk.'" I have seen no authority for the proposition that such "strong" evidence should be excepted from consideration in Dram Shop cases. Thus, I am of the opinion that the trial court erred by invading the province of the jury and would have reversed its summary judgment herein.

BRIEFS FOR APPELLANT
MICHAEL J. MOORE, AS THE
ADMINISTRATOR OF THE
ESTATE OF TIMOTHY M. MOORE:

Grahmn N. Morgan
Kristeena L. Johnson
Lexington, Kentucky


BRIEFS FOR APPELLANT
JESSICA SCHWEITZER,
INDIVIDUALLY AND AS NEXT
FRIEND TO HER MINOR
CHILDREN, AVERY SCHWEITZER
AND JACKSON SCHWEITZER,
AND AS EXECUTRIX OF THE
ESTATE OF JASON SCHWEITZER:

Ann B. Oldfather
Michael R. Hasken
Nicole A. Bush
Louisville, Kentucky


ORAL ARGUMENT FOR
APPELLANT MICHAEL J.
MOORE:

Kristeena L. Johnson
Lexington, Kentucky


ORAL ARGUMENT FOR
APPELLANT JESSICA
SCHWEITZER:

Nicole A. Bush
Louisville, Kentucky

BRIEFS FOR APPELLEE HANK
INVESTMENTS, INC. d/b/a
MALABU PUB:

Carroll M. Redford, III
Elizabeth C. Woodford
Lexington, Kentucky


ORAL ARGUMENT FOR
APPELLEES:

Carroll M. Redford, III
Lexington, Kentucky